UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
UNITED STATES OF AMERICA            )
                                    )
        v.                          )       Criminal No. 21-0454 (PLF)
                                    )
ANTHONY PUMA,                       )
                                    )
            Defendant.              )
_____)


OPINION AND ORDER

Defendant Anthony Puma has filed a Motion to Dismiss Counts One, Two, and

Three of the Indictment ("Def. Mot.") [Dkt. No. 20] pursuant to Rule 12(b) of the Federal Rules

of Criminal Procedure, arguing that those counts "fail to state an offense and fail to give proper

notice to the defendant." Id. at 1.  The United States opposes the motion, asserting that the

charges in the indictment satisfy the requirements of the applicable rules and of the United States

Constitution, and that Mr. Puma incorrectly characterizes the statutes pursuant to which he has

been charged.  Opposition to Defendant's Motion to Dismiss Counts One, Two, and Three of the

Indictment ("Gov't Opp.") [Dkt. No. 23] at 1-2.

For the following reasons, the Court concludes that the indictment adequately

states the offenses with which Mr. Puma is charged and provides sufficient notice.  The Court

therefore will deny Mr. Puma's motion.[1]

_____

[1]        The materials that the Court has considered in relation to the pending motion
include:  Statement of Facts ("Statement of Facts") [Dkt. No. 2-3]; Indictment ("Indictment")
[Dkt. No. 11]; Motion to Dismiss Counts One, Two, and Three of the Indictment ("Def. Mot.")
[Dkt. No. 20]; Opposition to Defendant's Motion to Dismiss Counts One, Two, and Three of the
Indictment ("Gov't Opp.") [Dkt. No. 23]; Defendant's Reply to Government's Response to
Motion to Dismiss Counts One, Two, and Three of the Indictment ("Def. Reply") [Dkt. No. 25];

## I.  BACKGROUND

The charges against Mr. Puma relate to the events at the United States Capitol on January 6, 2021.  The Court provides the following factual summary "for background purposes only," and these facts "do not inform the Court's analysis of [Mr. Puma's] motion to dismiss, which must be limited to 'the four corners of the indictment.'"  United States v. Montgomery, Crim. No. 21-046, 2021 WL 6134591, at *2 n.1 (D.D.C. Dec. 28, 2021) (quoting United States v. Safavian, 429 F. Supp. 2d 156, 161 n.2 (D.D.C. 2006)).

On January 6, 2021, a joint session of Congress convened to certify the results of the 2020 presidential election.  Statement of Facts at 1; see also Trump v. Thompson, 20 F.4th 10, 17 (D.C. Cir. 2021).  This certification process is mandated by the Twelfth Amendment to the U.S. Constitution and by the Electoral Count Act.  See U.S. CONST. amend. XII; 3 U.S.C. § 15.  Then-Vice President Mike Pence was present and presided over the certification. Statement of Facts at 1.  The U.S. Capitol Police "set up security barriers on the Capitol grounds" and posted signs indicating that the area was closed.  Gov't Opp. at 2-3.

Shortly before noon, at a rally at the White House, then-President Donald Trump "reiterated his claims that the election was 'rigged' and 'stolen,' and urged then-Vice President Pence . . . to 'do the right thing' by rejecting the various States' electoral votes and refusing to certify the election in favor of [Joseph] Biden."  Trump v. Thompson, 20 F.4th at 17-18.  As the court of appeals has recounted:

---

Defendant's Supplemental Brief in Further Support of Motion to Dismiss Counts One, Two, and Three of the Indictment ("Def. Suppl.") [Dkt. No. 28]; Government's Response to the Defendant's Supplemental Brief ("Gov't Suppl. Resp.") [Dkt. No. 30]; United States' Notice of Recent Authority Relevant to Defendant's Motion to Dismiss [Dkt. No. 34] and Notice of Additional Authority Supporting Mr. Puma's Motion to Dismiss 18 U.S.C. § 1512(c)(2) [Dkt. No. 36].

> Shortly after the speech, a large crowd of President Trump's
> supporters – including some armed with weapons and wearing full
> tactical gear – marched to the Capitol and violently broke into the
> building to try and prevent Congress's certification of the election
> results.  The mob quickly overwhelmed law enforcement and scaled
> walls, smashed through barricades, and shattered windows to gain
> access to the interior of the Capitol.  Police officers were attacked
> with chemical agents, beaten with flag poles and frozen water
> bottles, and crushed between doors and throngs of rioters.  As rioters
> poured into the building, members of the House and Senate, as well
> as Vice President Pence, were hurriedly evacuated from the House
> and Senate chambers.   Soon after, rioters breached the Senate
> chamber.  In the House chamber, Capitol Police officers barricaded
> the door with furniture and drew their weapons to hold off rioters.
> . . . Capitol Police were not able to regain control of the building and
> establish a security perimeter for hours.   The Joint Session
> reconvened late that night.  It was not until 3:42 a.m. on January 7th
> that Congress officially certified Joseph Biden as the winner of
> the 2020 presidential election.

Id. at 18 (internal citations and quotation marks omitted); see also Statement of Facts at 1-2.  The

United States alleges that Mr. Puma was a member of the crowd that entered the Capitol building

that day and engaged in certain activities while there.  See Indictment at 2.

A week before the insurrection, on December 31, 2020, Mr. Puma posted the

following comments on Facebook:  "On the 6th when we are all there in the capital and he is

givin (sic) his second term the people will see.  Then you never know we might have to start

killing some commie bastards.  #stopthesteal."  Statement of Facts at 7.  Mr. Puma left his home

in Michigan on January 5, 2021 and traveled by car to Washington, D.C., where he and his

friends stayed until January 7, 2021.  Id. at 3.  On January 5, he commented on a Facebook photo

of a crowd of people carrying Trump signs or flags, "Tomorrow is the big day.  Rig for Red, War

is coming."  Id. at 8-9.  In another post that same day, he wrote, "We are here.  What time do we

storm the House of Representatives? . . . . Hopefully we are storming the House of

Representatives tomorrow at 100pm."  Id. at 9.

On January 6, 2021, after attending the rally at which former President Trump spoke, Mr. Puma and his friends walked with the crowd to the U.S. Capitol.  Statement of Facts at 3.  In a video, Mr. Puma reportedly "can be heard encouraging others in front of him to move forward and clear the way for others trying to scale the wall of the Capitol."  Id. at 5.  Mr. Puma also "can be heard telling someone that he just scaled the wall."  Id. at 6.  The footage shows Mr. Puma "enter[ing] the U.S. Capitol through a window which was breached next to the west entrance."  Id.  In subsequent Facebook posts, Mr. Puma wrote:  "When I got up and over the wall I walked right into the front door and walked around in the capital bldg.  Cops everywhere everyone peaceful."  Id. at 11.  In comments on Facebook following the Capitol riot, Mr. Puma wrote: "I was there.  They were flash banging us.  Tear Gassing us.  Pepper spraying us.  We were outside.  Don't believe the NEWS.  I have hours of video on my go pro."  Id. at 9.  Mr. Puma allegedly live-streamed his activities at the Capitol on January 6.  Id. at 2; Gov't Opp. at 5.

On May 25, 2021, the United States charged Mr. Puma by criminal complaint with four misdemeanor offenses arising out of his conduct in relation to the Capitol riot.  See Complaint [Dkt No. 1].  On July 7, 2021, a grand jury returned an indictment charging Mr. Puma with the same four misdemeanor offenses and one felony.  See Indictment.

On November 1, 2021, Mr. Puma moved to dismiss Count One, Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; Count Two, Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); and Count Three, Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2).  Indictment at 1-2; Def. Mot. at 1.  The parties appeared via videoconference on January 28, 2022 for oral argument.  The motion is now ripe for decision.

Mr. Puma makes four arguments in favor of dismissal.  First, he contends that Count One fails to state an offense as charged because "Congress's role in counting the electoral votes . . . is not an 'official proceeding' contemplated in § 1512."  Def. Mot. at 8.  Second, Mr. Puma argues that Section 1512(c)(2) is unconstitutionally vague because it refers to acting "corruptly" in relation to an "official proceeding," and because it includes a residual clause.  Id. at 10-17.  Third, Mr. Puma argues that Counts Two and Three, which both charge violations of 18 U.S.C. § 1752, fail to state offenses because the U.S. Capitol Police, rather than the U.S. Secret Service, restricted the Capitol and its grounds.  Id. at 17-20.  And fourth, he argues that Counts Two and Three fail to state offenses because then-Vice President Pence and then-Vice President-elect Harris were not "temporarily visiting" the Capitol on January 6, 2021.  Id. at 20-22.

At least eleven other decisions from this Court have denied motions to dismiss filed by Capitol insurrection defendants raising some combination of these and other arguments. See United States v. Andries, Crim. No. 21-093, 2022 WL 768684 (D.D.C. Mar. 14, 2022) (Contreras, J.); United States v. Bozell, Crim. No. 21-216, 2022 WL 474144 (D.D.C. Feb. 16, 2022) (Bates, J.); United States v. Grider, Crim. No. 21-0022, 2022 WL 392307 (D.D.C. Feb. 9, 2022) (Kollar-Kotelly, J.); United States v. McHugh, Crim. No. 21-453, 2022 WL 296304 (D.D.C. Feb. 1, 2022) (Bates, J.); United States v. Reffitt, Crim. No. 21-032 (D.D.C. Dec. 29, 2021) [Dkt. No. 81] (Friedrich, J.); United States v. Montgomery, Crim. No. 21-046, 2021 WL 6134591 (D.D.C. Dec. 28, 2021) (Moss, J.); United States v. Nordean, Crim. No. 21-175, 2021 WL 6134595 (D.D.C. Dec. 28, 2021) (Kelly, J.); United States v. Mostofsky, Crim. No. 21-138, 2021 WL 6049891 (D.D.C. Dec. 21, 2021) (Boasberg, J.); United States v. Caldwell, Crim. No. 21-028, 2021 WL 6062718 (D.D.C. Dec. 20, 2021) (Mehta, J.);

United States v. Sandlin, Crim. No. 21-88, 2021 WL 5865006 (D.D.C. Dec. 10, 2021) (Friedrich, J.); United States v. Griffin, Crim. No. 21-92, 2021 WL 2778557 (D.D.C. July 2, 2021) (McFadden, J.). Each of these judges has rejected the same or analogous arguments advanced by Mr. Puma. One judge of this Court, however, has accepted some of these arguments and granted, in full and in part, two defendants' motions to dismiss. See United States v. Miller, Crim. No. 21-119, 2022 U.S. Dist. LEXIS 45696, at *38-39 (D.D.C. Mar. 7, 2022) (Nichols, J.) (concluding that "[defendant's] alleged conduct falls outside of § 1512(c)(2)"); United States v. Fischer, Crim. No. 21-234, 2022 WL 782413, at *4 (D.D.C. Mar. 15, 2022) (same). This Court concludes that both statutes, 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 1752, support the offenses as charged in Mr. Puma's indictment and are not unconstitutionally vague.

## II.  LEGAL STANDARD

A defendant in a criminal case may move to dismiss an indictment or count before trial for "failure to state an offense." FED. R. CRIM. P. 12(b)(3)(B)(v). In determining if an offense has been properly charged, the operative question is "whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed." United States v. Bowdoin, 770 F. Supp. 2d 142, 146 (D.D.C. 2011) (citing United States v. Sampson, 371 U.S. 75, 76 (1962)). In considering a motion to dismiss, a court must accept the allegations in the indictment as true. United States v. Ballestas, 795 F.3d 138, 149 (D.C. Cir. 2015).

"An 'indictment's main purpose is to inform the defendant of the nature of the accusation against him.'" United States v. Ballestas, 795 F.3d at 148-49 (quoting United States v. Hitt, 249 F.3d 1010, 1016 (D.C. Cir. 2001)). "It therefore need only contain 'a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" Id. at 149 (quoting FED. R. CRIM. P. 7(c)(1)). An indictment "is sufficiently specific where it (1) contains

6

the elements of the offense charged and fairly informs the defendant of those charges so that he

may defend against them, and (2) enables him to plead acquittal or conviction in bar of future

prosecutions for the same offense.'"  United States v. Safavian, 429 F. Supp. 2d at 158 (quoting

Hamling v. United States, 418 U.S. 87, 117-18 (1974)).

      "In ruling on a motion to dismiss for failure to state an offense, a district court is

limited to reviewing the face of the indictment and, more specifically, the language used to

charge the crimes."  United States v. Sunia, 643 F. Supp. 2d 51, 60 (D.D.C. 2009).  "Because a

court's use of its supervisory power to dismiss an indictment directly encroaches upon the

fundamental role of the grand jury, dismissal is granted only in unusual circumstances."  United

States v. Ballestas, 795 F.3d at 148 (alterations and quotation marks omitted).

### III.  18 U.S.C. § 1512(c)(2)

      The indictment alleges that "[o]n or about January 6, 2021," Mr. Puma "attempted

to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding

before Congress, specifically, Congress's certification of the Electoral College vote as set out in

the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18," in

violation of 18 U.S.C. § 1512(c)(2).  Indictment at 1.  That statute provides:

    (c)  Whoever corruptly—

> (1) alters, destroys, mutilates, or conceals a record,
> document, or other object, or attempts to do so, with the
> intent to impair the object's integrity or availability for use
> in an official proceeding; or

> (2) otherwise obstructs, influences, or impedes any official
> proceeding, or attempts to do so,

    shall be fined under this title or imprisoned not more than 20 years,
    or both.

18 U.S.C. § 1512(c).

### A. Congress' Certification of the Electoral College Vote is an "Official Proceeding"

Mr. Puma argues that "the electoral count is clearly a ceremonial and administrative event that is not an 'official proceeding' contemplated in § 1512," Def. Mot. at 8, because "the purpose of the law is to protect the integrity of hearings before tribunals by preventing witness tampering and destruction of evidence," id. at 4.

### 1. The Certification Falls Within the Plain Meaning of "Official Proceeding"

In construing a statute, the Court begins with the text "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997). Section 1512(c)(2) criminalizes obstructing, influencing, or impeding "any official proceeding." Section 1515 defines "official proceeding" as it is used in Section 1512 to include:

> (A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;
>
> (B) a proceeding before the Congress;
>
> (C) a proceeding before a Federal Government agency which is authorized by law; or
>
> (D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce[.]

18 U.S.C. § 1515(a)(1). The indictment specifically refers to subsection (B), "a proceeding before the Congress." Indictment at 1. Mr. Puma does not dispute that the certification of the

electoral count takes place "before the Congress" but he contends that it is not "a proceeding." See Def. Reply at 4; Def. Suppl. at 2.

        The text here "has a plain and unambiguous meaning with regard to the particular dispute in the case." Robinson v. Shell Oil Co., 519 U.S. at 340.  Even with the statutory definition, however, some interpretation is required because Section 1515 "does not define the term 'proceeding.'" United States v. Montgomery, 2021 WL 6134591, at *5.  While "proceeding" may refer broadly to "[a]n act or step that is part of a larger action," see United States v. Montgomery, 2021 WL 6134591, at *5 (quoting Proceeding, BLACK'S LAW DICTIONARY (11th ed. 2019)), the Court agrees with the other judges to have confronted this question: "the legal – rather than the lay – understanding of [the] term 'proceeding' is implicated in the statute." United States v. Caldwell, 2021 WL 6062718, at *4 (quoting United States v. Ermoian, 752 F.3d 1165, 1169 (9th Cir. 2013)); accord United States v. Andries, 2022 WL 768684, at *4; United States v. Bozell, 2022 WL 474144, at *4; United States v. Grider, 2022 WL 392307, at *4; United States v. McHugh, 2022 WL 296304, at *5; United States v. Montgomery, 2021 WL 6134591, at *5; United States v. Sandlin, 2021 WL 5865006, at *3; see also United States v. Miller, 2022 U.S. Dist. LEXIS 45696, at *13 (defining "proceeding" as "[t]he business conducted by a court or other official body; a hearing," and concluding that "[t]he certification of the Electoral College results by Congress is 'business conducted by a[n] . . . official body'") (quoting Proceeding, BLACK'S LAW DICTIONARY (11th ed. 2019)).

        At oral argument, the parties agreed that the controlling definition of "proceeding" should be the one adopted by Judge Friedrich in Sandlin.  See United States v. Sandlin, 2021 WL 5865006, at *3 ("An "official proceeding" under § 1512(c)(2) . . . must be

akin to a formal hearing.").  This definition requires that there must be a kind of formality that "has the trappings of a formal hearing before an official body."  Id. at *4; see also United States v. Montgomery, 2021 WL 6134591, at *10 (Congress must have "convened in some formal respect for the purpose of conducting [official] business."); United States v. McHugh, 2022 WL 296304, at *6 ("a formal assembly of the Congress for the purpose of conducting official business").[2]  The parties disagree, however, on the question of whether the certification of the Electoral College constitutes a hearing, akin to an "official proceeding."

The Court concludes that Congress' activities on January 6, 2021, clearly constitute a formal assembly akin to a hearing and thus fall within this definition of an "official proceeding" before "the Congress."  The certification of the Electoral College vote is the business of an official body – the U.S. Congress – and this business is mandated by both the U.S. Constitution and federal statute.  See U.S. CONST. amend. XII; 3 U.S.C. § 15.  As Judge Mehta explained:

> Congress jointly convened on January 6 to open, potentially debate, and count the Electoral College votes.  The Vice President presided over the Joint Session.  And Congress had started to carry out its constitutional and statutory duties before Defendants and others entered the Capitol building.  This was the "business" of an "official body" on January 6.  The Certification of the Electoral College vote thus meets the definition of an "official proceeding."

United States v. Caldwell, 2021 WL 6062718, at *4 (citations omitted).

---

[2]      In United States v. McHugh, Judge Bates found that "'a proceeding before the Congress' must be a formal assembly of the Congress for the purpose of conducting official business and must involve some other entity as an integral component."  2022 WL 296304, at *6.  Although Judge Bates adds an extra requirement to this Court's definition of "a proceeding before the Congress," Judge Bates concludes that the certification qualifies because it "involves a second entity as an integral component: the Electoral College."  Id. at *7; accord United States v. Bozell, 2022 WL 474144, at *4.

Mr. Puma in his supplemental brief suggests that Judges Moss, Kelly, Mehta, and Friedrich failed to adequately account for the "ceremonial" or "ministerial" nature of the Electoral College certification, and thus have not fully considered whether the certification is, in fact, a "proceeding." Def. Suppl. Br. at 2-3. He suggests that Congress lacks authority to resolve problems or disputes related to the Electoral College count, and that the certification is simply a ceremony that "decides nothing." Id. at 5.

This logic is flawed. As Judge Friedrich explained, the certification "has the trappings of a formal hearing before an official body," including "a presiding officer, a process by which objections can be heard, debated, and ruled upon, and a decision . . . that must be reached before the session can be adjourned." United States v. Sandlin, 2021 WL 5865006, at *4; accord United States v. Caldwell, 2021 WL 6062718, at *7 ("[I]t is inaccurate to characterize the Certification that occurred on January 6 as a 'purely ministerial, legislative vote-counting event.'"). While the Court is aware of no cases outside the Capitol insurrection context interpreting the phrase "a proceeding before the Congress" in Section 1515(a)(1)(B), a number of decisions have construed the phrase "a proceeding before a Federal Government agency which is authorized by law" in Section 1515(a)(1)(C) to refer to something more than law enforcement investigative activities or an agency's internal investigation. See, e.g., United States v. Sutherland, 921 F.3d 421 (4th Cir. 2019) (investigation by U.S. Attorney's office, which led to criminal charges, is not an official proceeding); United States v. Ermoian, 752 F.3d 1165 (9th Cir. 2013) (FBI investigation is not an official proceeding); United States v. Ramos, 537 F.3d 439 (5th Cir. 2008) (internal investigation by administrative agency into employee conduct is not an official proceeding). These cases suggest that an "official proceeding" entails some level of formality.

In fact, Mr. Puma elsewhere acknowledges that Congress' role in certifying the Electoral College vote includes "ensuring that the requirements for certification have been followed," Def. Mot. at 10, which by any commonsense understanding requires more than a "ceremonial" or "ministerial" function.  Mr. Puma's discussion of the "history of objections" during past certifications provide no guidance.  <u>See</u> Def. Suppl. Br. at 4-5.  Objections made before the Electoral Count Act was passed in 1987 are irrelevant to this inquiry, and any debate in the historical record following the Act's passage is hardly evidence that the certification process is merely "ceremonial."  <u>See also</u> <u>United States v. McHugh</u>, 2022 WL 296304, at *9 ("[T]he fact that Congress's adjudicative domain is limited to procedural disputes . . . does not render the quadrennial certification of the electoral vote 'ceremonial.'") (internal citation omitted).

In addition, the fact that the certification is enshrined in both the U.S. Constitution and a federal statute suggests that certification is not as trivial as Mr. Puma suggests.  The drafters of the Twelfth Amendment and the Congress that enacted the Electoral Count Act evidently considered it necessary not merely to authorize, but to require Congress to perform this function, including by resolving any objections to the electoral count at the certification.  Neither the Twelfth Amendment nor the Electoral Count Act state that the certification is merely ministerial.  <u>See</u> U.S. Const. amend. XII; 3 U.S.C. § 15.  Even if Mr. Puma's description of the certification process were accurate, that would not negate the fact that the certification is a "proceeding."  There is no requirement in Section 1515 or in the common usage of the term "proceeding" that a "proceeding" be capable of yielding a particular type of outcome.

2.  An Official Proceeding Need Not be Adjudicative or Involve Witness Testimony and Evidence

Mr. Puma urges the Court to conclude that an "official proceeding" must resemble "an adjudicative proceeding involving witness testimony and evidence."  Def. Mot. at 8; see also id. at 4 ("[T]he purpose of the law is to protect the integrity of hearings before tribunals by preventing witness tampering and destruction of evidence.").  There is no such requirement.  First, the cases Mr. Puma cites in support of this argument all involve the definition of "official proceeding" that relates to "a proceeding before a Federal Government agency which is authorized by law."  18 U.S.C. § 1515(a)(1)(C); see Def. Reply at 3-4.  In other words, all of those cases involved proceedings conducted by the Executive Branch or an administrative agency.  To the extent that certain courts have held that the charged conduct must relate to records, witness testimony, or to an adjudication, see Def. Mot. at 7, any such requirement would not apply here because "n[one] of those cases touched on the question of whether 'a proceeding before Congress' should be construed narrowly to encompass only a subspecies of congressional proceeding."  United States v. Caldwell, 2021 WL 6062718, at *6; see also United States v. Andries, 2022 WL 768684, at *6; United States v. Bozell, 2022 WL 474144, at *5 ("The statute's prohibition on 'obstruct[ing], influenc[ing], or imped[ing] any official proceeding' contains no suggestion that it applies only to acts related to interfering with evidence.").  Moreover, a "proceeding before the Congress" cannot be construed as limited to a quasi-judicial proceeding involving the administration of justice because "[a]s a matter of separation of powers, that is not what Congress does."  United States v. Montgomery, 2021 WL 6134591, at *7; see also United States v. McHugh, 2022 WL 296304, at *8 ("Requiring a § 1515 'proceeding' to be adjudicative would make 'a proceeding before the Congress' something close to a null set.").

The statutory structure also refutes Mr. Puma's proposed construction.  Whereas other parts of Section 1512 are limited to proceedings "before a judge, court, magistrate judge or government agency," 18 U.S.C. § 1512(g)(1), or simply to "an official proceeding," id. §§ 1512(a)(1)(A)-(B), (a)(2)(A)-(B), (b)(1)-(2), (c)(1), (d)(1), subsection (c)(2) of Section 1512 refers to "any official proceeding."  "It follows that Section 1512(c)(2) reaches not just a subset of official proceedings, but all official proceedings of whatever kind."  United States v. Montgomery, 2021 WL 6134591, at *4 (quotation marks omitted). "The lesson to draw from the varying language used in different subsections of Section 1512 is that, when Congress intended to focus on interfering with the 'testimony of any person,' 18 U.S.C. § 1512(a)(1)(A), (2)(A), 'evad[ing] legal process,' id. § 1512(a)(2)(B)(iii), (b)(2)(C), or 'destroy[ing] . . . object[s],' id. § 1512(a)(2)(B)(ii), (b)(2)(B), (c)(1), it said so.  The Court need not, and should not, construe the broad definition of 'official proceeding' contained in Section 1515 to achieve indirectly, and without textual basis, the same ends that Congress achieved with far greater precision . . . in the detailed subsections of Section 1512."  United States v. Montgomery, 2021 WL 6134591, at *8.

The language in nearby statutory provisions reinforces the conclusion that if Congress had intended to limit Section 1512(c)(2) to adjudicative or court-like proceedings, it would have used different words to do so.  "Long before Congress enacted Section 1515(a)(1) [defining 'official proceeding'], it had enacted Section 1503, which prohibits obstruction of 'the due administration of justice,' and it had enacted Section 1505, which prohibits the obstruction of 'the due and proper exercise of the power of inquiry or investigation . . . by either House, or any committee of either House or any joint committee of the Congress.'"  United States v. Montgomery, 2021 WL 6134591, at *6 (internal citations omitted).  "That Congress decided to incorporate into section 1512(c) an existing definition of 'official proceeding' that broadly

includes 'a proceeding before Congress,' as opposed to one limited to its 'power of inquiry,' is therefore consequential," and "means that Congress did not intend to limit the congressional proceedings protected under section 1512(c) to only those involving its adjudicatory, investigative, or legislative functions."  United States v. Caldwell, 2021 WL 6062718, at *5. "Had it wanted to, Congress could have just as easily borrowed language from just a few statutory sections away."  United States v. Grider, 2022 WL 392307, at *4.  But it did not choose to do so.

Mr. Puma's legislative history argument, see Def. Mot. at 6, fares no better. Section 1512(c)(2) was enacted as part of the Sarbanes-Oxley Act of 2002, which sought "to protect investors and restore trust in financial markets following the collapse of the Enron Corporation," Yates v. United States, 574 U.S. 528, 532 (2015) (plurality opinion), "prompted by the exposure of Enron's massive accounting fraud and revelations that the company's outside auditor . . . had systematically destroyed potentially incriminating documents," id. at 535.  In Yates, the Supreme Court construed part of Sarbanes-Oxley, 18 U.S.C. § 1519, and concluded in light of that statute's history that "a matching construction of § 1519 is in order:  A tangible object captured by § 1519 . . . must be one used to record or preserve information."  Id. at 532. Mr. Puma argues that "official proceeding" in Section 1512(c)(2) must likewise be construed as contemplating the same type of "adversarial nature" as a court proceeding. Def. Mot. at 6.  The Court disagrees.

Judge Moss explained in detail why the legislative purpose that animated the Sarbanes-Oxley Act does not constrain Section 1512(c)(2) in this manner.  See United States v. Montgomery, 2021 WL 6134591, at *15-17.  In summary, unlike the provision at issue in Yates, Section 1512(c)(2) was added to the Sarbanes-Oxley bill "late in the legislative process" as a

floor amendment.  Id., at *16.  It did not grow out of the committee process through which

Congress "trained its attention on corporate and accounting deception and coverups."  Yates v.

United States, 574 U.S. at 532.  Instead, Congress added Section 1512(c) later "to 'close[] [a]

loophole."  United States v. Montgomery, 2021 WL 6134591, at *15 (quoting 148 Cong. Rec.

S6550 (daily ed. July 10, 2002) (statement of Sen. Hatch)).  Previously, Section 1512 had

imposed criminal liability only for causing another to commit various obstructive acts.  After

Congress added subsection (c)(2), the statute imposed liability on one who commits those acts

herself.  Id.  "[I]n closing that loophole, there is no reason to believe that Congress intended to

fix that problem only with respect to the availability or integrity of evidence."  Id. at *16

(quotation marks omitted).  The fact "[t]hat Congress acted due to concerns about document

destruction and the integrity of investigations of corporate criminality does not define the

statute's scope," as "[s]tatutes often reach beyond the principal evil that animated them."  United

States v. Sandlin, 2021 WL 5865006, at *9 (citing Oncale v. Sundowner Offshore Servs.,

Inc., 523 U.S. 75, 79 (1998)).  "[A]lthough a statute's purpose can sometimes clarify what

Congress said, '[v]ague notions of a statute's 'basic purpose' are inadequate to overcome the

words of its text regarding the specific issue under consideration.'"  United States v.

McHugh, 2022 WL 296304, at *8 (internal citations omitted).

>               For these reasons, the Court concludes that Congress' certification of the Electoral

College vote is an "official proceeding" within the meaning of Section 1512(c)(2).  "To conclude

otherwise would require a departure from common usage and common sense."  United States v.

Montgomery, 2021 WL 6134591, at *10.

B.  *18 U.S.C. § 1512(c)(2) is Not Unconstitutionally Vague*

Mr. Puma next argues that Section 1512(c)(2) is unconstitutionally vague because it "uses words throughout both sections" – "corruptly" and "official proceeding" – "that require courts to speculate as to their meaning in the context of the defendant's particular actions," and because "subsection (c)(2) is a 'residual clause,' [] that is ambiguous."  Def. Mot. at 11.

"A law is impermissibly vague in violation of the Fifth Amendment's Due Process Clause if 'it fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement.'"  United States v. Montgomery, 2021 WL 6134591, at *18 (quoting Johnson v. United States, 576 U.S. 591, 595 (2015)).  "[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal."  United States v. Lanier, 520 U.S. 259, 267 (1997).  "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."  United States v. Williams, 553 U.S. 285, 306 (2008).  Thus "the vagueness doctrine does 'not doubt the constitutionality of laws that call for the application of a qualitative standard . . . to real-world conduct; the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree.'"  United States v. Bronstein, 849 F.3d 1101, 1108 (D.C. Cir. 2017) (quoting Johnson v. United States, 576 U.S. at 603-04) (alterations in original).

Mr. Puma challenges the statute as vague both on its face and as applied to his conduct.  "[A] criminal statute is not unconstitutionally vague on its face unless it is 'impermissibly vague in all of its applications.'"  United States v. Sandlin, 2021 WL 5865006, at *10 (quoting Village of Hoffman Ests. v. Flipside, Hoffman Ests., 455 U.S. 489, 497 (1982)).

Because the Court concludes that the statute plainly covers the charges against Mr. Puma, it need not "analyz[e] other hypothetical applications of the law," Village of Hoffman Ests. v. Flipside, Hoffman Ests., 455 U.S. at 497, or determine "the outer contours" of the statute's application, United States v. Sandlin, 2021 WL 5865006, at *13. See also United States v. McHugh, 2022 WL 296304, at *9 ("[T]he vagueness determination 'must be made on the basis of the statute itself and other pertinent law, rather than on the basis of an ad hoc appraisal of the subjective expectations of particular defendants.'") (quoting Bouie v. City of Columbia, 378 U.S. 347, 355 n.5 (1964)).

### 1.  The Term "Corruptly" Is Not Unconstitutionally Vague

The text of Section 1512(c), and the inclusion of the term "corruptly," "give[s] fair notice of the conduct it punishes" and does not invite "arbitrary enforcement."  See Johnson v. United States, 576 U.S. at 596; see also United States v. Bronstein, 849 F.3d at 1107 ("[A] statutory term is not rendered unconstitutionally vague because it does not mean the same thing to all people, all the time, everywhere . . . . Rather, a statute is unconstitutionally vague if, applying the rules for interpreting legal texts, its meaning specifies no standard of conduct . . . at all.") (internal citation and quotation marks omitted) (second alteration in original).

Judges in this district have construed "corruptly" to require "a showing of 'dishonesty' or an 'improper purpose,'" United States v. Montgomery, 2021 WL 6134591, at *19 (collecting cases), "consciousness of [] wrongdoing," United States v. Bozell, 2022 WL 474144, at *6; United States v. Caldwell, 2021 WL 6062718, at *11, or conduct that is "independently criminal," "inherently malign, and committed with the intent to obstruct an official proceeding," United States v. Sandlin, 2021 WL 5865006, at *13 (internal citations omitted).  These constructions support a consensus that Section 1512(c) clearly punishes those

who "endeavor[] to obstruct" an official proceeding by acting "with a corrupt purpose, or . . . by independently corrupt means, or [] both." United States v. Nordean, 2021 WL 6134595, at *11 (quoting United States v. North, 91- F.2d 843, 942-43 (D.C. Cir. 1990) (Silberman, J., concurring in part and dissenting in part), withdrawn and superseded in part on reh'g, 920 F.2d 940 (D.C. Cir. 1990)); see also United States v. Andries, 2022 WL 768684, at *11 ("['Corruptly'] separates innocent attempts to 'obstruct[], influence[], or impede' an official proceeding from those undertaken with a wrongful purpose."). Understood in this way, "corruptly" not only clearly identifies the conduct it punishes; it also "acts to shield those who engage in lawful, innocent conduct – even when done with the intent to obstruct, impede, or influence the official proceeding." United States v. Sandlin, 2021 WL 5865006, at *13.

Mr. Puma instead focuses on one D.C. Circuit decision ruling on a vagueness challenge to a different statute, 18 U.S.C. § 1505, as applied to the conduct at issue in that case. See United States v. Poindexter, 951 F.2d 369, 377 (D.C. Cir. 1991) ("Poindexter challenges his § 1505 convictions on the ground that use of the term 'corruptly' renders the statute unconstitutionally vague as applied to this conduct."). In Poindexter, former National Security Advisor John M. Poindexter was charged with violating 18 U.S.C. § 1505 by making false statements and representations to Congress and by deleting records from his computer. Id. at 373. Section 1505, as then written, made it a crime to "corruptly, or by threats or force, or by any threatening letter or communication influence[], obstruct[], or impede[] or endeavor[] to influence, obstruct, or impede the due and proper administration of the law . . . ." 18 U.S.C. § 1505 (1991). Admiral Poindexter only challenged the constitutionality of the statute insofar as it applied to allegations regarding false and misleading statements. United States v. Poindexter, 951 F.2d at 377 ("The question in this case is whether the meaning [the statute] does

have is sufficiently definite, as applied to the conduct at issue on this appeal, <u>viz</u>. lying to the Congress, to be the basis of a criminal conviction.").

In that specific context, the court of appeals held that "on its face, the word 'corruptly' is vague; that is, in the absence of some narrowing gloss, people must guess at its meaning and as to its application."  <u>United States v. Poindexter</u>, 951 F.2d at 378 (quotation marks omitted).  The court of appeals proceeded to consider the legislative history and prior judicial interpretations of Section 1505, concluded that neither "supplies the constitutionally required notice that the statute on its face lacks," and held that "the statute is unconstitutionally vague as applied to Poindexter's conduct."  <u>Id</u>. at 386.  After the D.C. Circuit's decision in <u>Poindexter</u>, Congress amended Section 1515 to define the word "corruptly" as used in Section 1505 as "acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information."  18 U.S.C. § 1515(b); <u>see</u> <u>also</u> False Statements Accountability Act of 1996, H.R. 3166, 104th Cong. § 3 (1996).

As Judge Mehta and Judge Moss explained in detail, Mr. Puma's reliance on <u>Poindexter</u> is misplaced.  "Most notably, (1) <u>Poindexter</u> turned on the specific language of 18 U.S.C. § 1505 as then written and the specific charge in that case – that is, lying to Congress; (2) '[i]n the end, the [D.C. Circuit] did not conclude that 'corruptly' [even as used] in [S]ection 1505 was unconstitutionally vague as applied to all conduct;' and (3) '[m]uch has transpired in the four decades that have passed since <u>Poindexter</u>."  <u>United States v.</u>

Montgomery, 2021 WL 6134591, at *18 (quoting United States v. Caldwell, 2021 WL 6062718, at *8-10) (internal citations omitted).[3]

In subsequent cases, courts have "cabined Poindexter's holding to its facts and have not read it as a broad indictment of the use of the word corruptly in the various obstruction-of-justice statutes."  United States v. Sandlin, 2021 WL 5865006, at *11 (quotation marks omitted); accord United States v. Andries, 2022 WL 768684, at *10; United States v. Grider, 2022 WL 392307, at *6; United States v. McHugh, 2022 WL 296304, at *10; United States v. Nordean, 2021 WL 6134595, at *10; United States v. Caldwell, 2021 WL 6062718, at *9.  For example, in United States v. Shotts, the Eleventh Circuit found that under 18 U.S.C. § 1512(b)(2), "[it]t is reasonable to attribute to the 'corruptly persuade' language [] the same well-established meaning already attributed by the courts to the comparable language in Section 1503(a), i.e., motivated by an improper purpose."  145 F.3d 1289, 1301 (11th Cir. 1998); see also United States v. Edwards, 869 F.3d 490, 501-02 (7th Cir. 2017) (applying the same logic to 18 U.S.C. §1512(b)(3)).

What is more, the D.C. Circuit and the Supreme Court have also taken up similar questions.  Five years after Poindexter, in United States v. Morrison, the D.C. Circuit denied a defendant's vagueness challenge to 18 U.S.C. § 1512(b), which provides criminal penalties for "[w]hoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person."  See United States v. Morrison, 98 F.3d 619, 629 (D.C. Cir. 1996) (quoting 18 U.S.C. § 1512(b)) (emphasis added).  In Morrison, the D.C. Circuit rejected the application of

---

[3]     In addition, "the concern that animated Poindexter" is not present here because the court of appeals' reasoning in that case centered on a transitive use of the term "corruptly" – compelling another to violate their legal duty – whereas in Section 1512(c)(2) the adverb is used intransitively to refer to the defendant's own conduct.  United States v. Nordean, 2021 WL 6134595, at *10 (quoting United States v. Caldwell, 2021 WL 6062718, at *10).

Poindexter to Section 1512, and emphasized Poindexter's narrow holding.  Id. at 630 ("While we agree that the two statutes are [] similar . . . we disagree with Morrison's claim that his conduct could not still fall under the statutory ban.").

        The Supreme Court examined Section 1512 in Arthur Andersen LLP v. United States and, as in Morrison, found no vagueness problem with the statute or with the term "corruptly."  Arthur Andersen LLP v. United States, 544 U.S. 696 (2005).  The Court instead observed that "corrupt" and "corruptly" "are normally associated with wrongful, immoral, depraved, or evil," id. at 705, and "did not cast any doubt on the constitutional adequacy of a 'corruptly' standard."  United States v. Montgomery, 2021 WL 6134591, at *19.  The Court held that "limiting criminality to [individuals] conscious of their wrongdoing sensibly allows § 1512(b) to reach only those with the level of 'culpability . . . we usually require in order to impose criminal liability.'"  Arthur Andersen LLP v. United States, 544 U.S. at 706 (quoting United States v. Aguilar, 515 U.S. 593, 602 (1995)).  In sum, the narrow holding in Poindexter does not mean that the word "corruptly" necessarily renders a criminal statute unconstitutionally vague, nor does it compel a conclusion that Section 1512(c)(2) is vague as applied to Mr. Puma's conduct.  See United States v. Sandlin, 2021 WL 5865006, at *11.

        Mr. Puma nevertheless maintains that the conclusions in Nordean, Montgomery, Sandlin, and Caldwell do not resolve his case because even if "corruptly" may not have been vague as applied in those cases, it is still vague as applied to Mr. Puma.  Def. Suppl. at 5-6.  He argues that unlike those other defendants, "Mr. Puma's conduct does not fit squarely within the core coverage of 'corruptly' because his actions" – allegedly trespassing within the Capitol grounds and building – "are not inextricably intertwined with an intent to obstruct the vote count."  Id.  He suggests that he "could not have possibly been on notice that he was committing

a felony obstruction of an official proceeding" because he entered the Capitol building "long after Congress was already evacuated" and certain statements of his identified by the United States were made after January 6, 2021.  Def. Mot. at 15.

This is an argument about facts to be litigated at trial, not whether the indictment properly states a claim.  The argument fails for two main reasons.  First, Poindexter is inapposite because Poindexter concerned a post-conviction challenge to the defendant's charges, after the court had evaluated the full panoply of the evidence introduced at trial.  See United States v. Poindexter, 951 F.2d at 372.  Here, Mr. Puma challenges the sufficiency of the allegations in the indictment at the pre-trial motion to dismiss phase.  Second, this indictment, like the indictments at issue in Sandlin and Montgomery – that are also non-speaking indictments – "alleges obstructive acts that fall on the obviously unlawful side of the line."  United States v. Sandlin, 2021 WL 5865006, at *13.  The indictment charges that Mr. Puma "attempted to, and did, corruptly obstruct, influence, and impede an official proceeding . . . specifically, Congress's certification of the Electoral College vote."  Indictment at 1.  It does not discuss his specific obstructive acts in further detail.  Thus, Mr. Puma's as applied challenge raises "matters outside the four corners of the indictment," and "[t]he Court cannot properly consider such matters in evaluating a motion to dismiss the indictment."  United States v. Safavian, 429 F. Supp. 2d at 159.  Mr. Puma "will have an opportunity to make these arguments—but the instant motion is not it."  United States v. McHugh, 2022 WL 296304, at *13; see also United States v. Reffitt, Crim. No. 21-032 [Dkt. No. 81] at 6 ("Because the Court cannot determine, based on the indictment alone, whether [the defendant] was sufficiently on notice that his conduct was criminal, it will deny his motion to dismiss on this ground as premature."); United States v. Andries, 2022 WL 768684, at *8 ("[The court] may not replace the jury as the decider of factual

disputes between the parties."). The question of whether Mr. Puma did, in fact, act "corruptly," as the indictment charges, is simply not before the Court.

### 2. Mr. Puma's Other Vagueness Arguments Are Unavailing

For many of the reasons already explained by Judges Mehta, Friedrich, Boasberg, Moss, Kollar-Kotelly, and Bates, Mr. Puma's other vagueness arguments also fail. First, the term "official proceeding" in Section 1512(c)(2) "presents no vagueness problem." United States v. Caldwell, 2021 WL 6062718, at *8; see also United States v. McHugh, 2022 WL 296304, at *12. As discussed at length above, the term clearly encompasses Congress' certification of the Electoral College count. "[I]t is difficult to fathom that a reasonable person would not believe the Electoral College certification was an official proceeding, especially since the definition of that term includes 'a proceeding before [the] Congress.'" United States v. Mostofsky, 2021 WL 6049891, at *11. The statute, including the definition in Section 1515(a)(1), gives "fair notice" that "the conduct it punishes" extends to obstruction of that proceeding. Johnson v. United States, 576 U.S. at 595.

Second, the fact that an individual can violate the statute by "otherwise" obstructing, influencing, or impeding an official proceeding similarly does not give rise to unconstitutional vagueness. Mr. Puma suggests that because the Supreme Court in United States v. Johnson, 576 U.S. 591 (2015), found that the "residual clause" of the Armed Career Criminal Act ("ACCA") violated due process, the same must be true of the "residual clause" in Section 1512(c)(2). See Def. Mot. at 11. First, Johnson does not stand for the proposition that any criminal provision with a residual clause is necessarily vague. Cf. United States v. Davis, 129 S. Ct. 2319, 2327 (2019) (stating that if Congress had written the residual clause of ACCA to require "a case-specific approach," then "there would be no vagueness problem").

24

And second, unlike the residual clause of ACCA at issue in <u>Johnson</u>, Section 1512(c)(2) does <u>not</u> require the Court to "imagine the kind of conduct typically involved in a crime" in order to determine whether that crime, in the abstract, met the statutory criteria.  <u>United States v. Johnson</u>, 576 U.S. at 600.  Rather, a defendant violates Section 1512(c)(2) if his <u>own</u> conduct "obstructs, influences, or impedes any official proceeding."  18 U.S.C. § 1512(c)(2).

The word "otherwise" carries a clear meaning as it is used in Section 1512(c)(2).  The first subsection of Section 1512(c) describes how a defendant can violate the statute by "alter[ing], destroy[ing], mutilat[ing], or conceal[ing]" documents for use in an official proceeding.  <u>See</u> 18 U.S.C. § 1512(c)(1).  The word "otherwise" in the second subsection clarifies that a defendant can violate Section 1512(c)(2) through "obstruction by means <u>other than</u> document destruction."  <u>United States v. Mostofsky</u>, 2021 WL 6049891, at *11 (quoting <u>United States v. Sandlin</u>, 2021 WL 5865006, at *5)); <u>accord</u> <u>United States v. Andries</u>, 2022 WL 768684, at *9; <u>United States v. Bozell</u>, 2022 WL 474144, at *5; <u>United States v. Montgomery</u>, 2021 WL 6134591, at *11-12; <u>United States v. Nordean</u>, 2021 WL 6134595, at *6; <u>but see</u> <u>United States v. Fischer</u>, 2022 WL 782413, at *4; <u>United States v. Miller</u>, 2022 U.S. Dist. LEXIS 45696 (reaching the opposite conclusion regarding the function of "otherwise" in the statute). [4]

---

[4]  Judge Nichols' analysis in <u>Miller</u> largely revolves around his interpretation of the Supreme Court's decision in <u>Begay v. United States</u>, 553 U.S. 137 (2008), <u>abrogated on other grounds by</u> <u>Johnson v. United States</u>, 576 U.S. 591 (2015), which held that the word "otherwise" in the Armed Career Criminal Act "limit[ed] the scope of the clause to crimes that are similar to the examples" listed before the residual clause.  <u>See</u> <u>United States v. Miller</u>, 2022 U.S. Dist. LEXIS 45696, at *17-25 (discussing <u>Begay v. United States</u>, 553 U.S. at 143).  Based on this language, Judge Nichols rejects the government's argument that "otherwise" means "in a different way or manner," and therefore "serves as a clean break between subsections (c)(1) and (2)."  <u>United States v. Miller</u>, 2022 U.S. Dist. LEXIS 45696, at *16.  Instead, Judge Nichols finds that "the Court is left with a serious ambiguity in a criminal statute," and therefore "is under an obligation to exercise restraint in construing criminal laws and to apply the rule of

In sum, "'Section 1512(c)(2) gives defendants fair warning in plain language that a crime will occur in a different ('otherwise') manner compared to § 1512(c)(1) if the defendant 'obstructs, influences, or impedes any official proceeding' without regard to whether the action relates to documents or records.'" United States v. Caldwell, 2021 WL 6062718, at *12 (quoting United States v. Petruk, 781 F.3d 438, 446-47 (8th Cir. 2015)) (emphasis added in Caldwell). The Court thus finds, contrary to Judge Nichols' reasoning in Miller, that "Section 1512(c)'s structure [] does not support narrowly construing subsection (c)(2)'s otherwise expansive plain text." United States v. Sandlin, 2021 WL 5865006, at *6.

Third, the Court is not persuaded by Mr. Puma's suggestion that Section 1512(c)(2) has given rise to arbitrary or inconsistent charging decisions. See Def. Mot. at 13-14. "[T]he fact that other January 6 defendants have not been charged under section 1512(c)(2)" presents no vagueness problem because "[d]iscretionary prosecutorial decisions cannot render vague as applied a statute that by its plain terms provides fair notice." United States v. Caldwell, 2021 WL 6062718, at *8; see also United States v. Grider, 2022

---

lenity." Id. at *39, *10.  Judge Nichols therefore concludes that "§ 1512(c)(2) must be interpreted as limited by subsection (c)(1), and thus requires that the defendant have taken some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding." United States v. Miller, 2022 U.S. Dist. LEXIS 45696, at *39-40; accord United States v. Fischer, 2022 WL 782413, at *4.

This Court disagrees with Judge Nichols' application of Begay to Section 1512, and agrees with Judge Moss who has previously rejected this same argument.  See United States v. Montgomery, 2021 WL 6134591, at *11 ("Begay's discussion of the word 'otherwise' is remarkably agnostic. The Supreme Court merely observed that 'the word "otherwise" can (we do not say must) refer to a crime that is similar to the listed examples in some respects but different in others.'").  Further, the Court disagrees with Judge Nichols' premise that any "genuine ambiguity persist[s]." United States v. Miller, 2022 U.S. Dist. LEXIS 45696, at *10; see United States v. Montgomery, 2021 WL 6134591, at *23 ("[A]ll of the essential terms of the statute have well-accepted meanings and . . . the Court is not left simply to guess what Congress intended."); see also United States v. Bozell, 2022 WL 474144, at *7.  The rule of lenity is therefore inapplicable.

WL 392307, at *7; United States v. McHugh, 2022 WL 296304, at *12 ("the mere existence of

enforcement discretion 'does not render a statutory scheme unconstitutionally vague.'") (quoting

Kincaid v. Gov't of D.C., 854 F.3d 721, 729 (D.C. Cir. 2017)).  Moreover, charging decisions

fall squarely within the province of the Executive Branch and "[f]ew subjects are less adapted to

judicial review than the exercise by the Executive of his discretion in deciding when and whether

to institute criminal proceedings, or what precise charge shall be made."  United States v. Fokker

Servs. B.V., 818 F.3d 733, 741 (D.C. Cir. 2016) (quotation marks omitted) (alteration in

original).  The Court agrees with Judges Friedrich and McFadden that disparate charging

decisions "are not an appropriate consideration at this stage" of the case.  United States v.

Sandlin, 2021 WL 5865006, at *9; United States v. Griffin, 2021 WL 2778557, at *7.

       For all of the reasons discussed above, the Court concludes that, "[a]ssuming that

the government can meet its burden at trial, which is appropriate to assume for purposes of this

motion, [Mr. Puma was] sufficiently on notice that [he] corruptly obstructed, or attempted to

obstruct, an official proceeding under § 1512(c)(2)."  United States v. Sandlin, 2021

WL 5865006, at *13.

### IV. 18 U.S.C. § 1752

       Mr. Puma also moves to dismiss the charges against him pursuant to 18 U.S.C.

§§ 1752(a)(1) and (a)(2).  That statute provides:

> (a)  Whoever—
>
>     (1)  knowingly enters or remains in any restricted building
> or grounds without lawful authority to do so;
>
>     (2)  knowingly, and with intent to impede or disrupt the
> orderly conduct of Government business or official
> functions, engages in disorderly or disruptive conduct in, or
> within such proximity to, any restricted building or grounds
> when, or so that, such conduct, in fact, impedes or disrupts

the orderly conduct of Government business or official functions; . . .

or attempts or conspires to do so, shall be punished as provided in subsection (b) . . . .

(c)  In this section—

(1) the term "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area—

(A) of the White House or its grounds, or the Vice President's official residence or its grounds;

(B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

(C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.

18 U.S.C. §§ 1752(a), (c).  Mr. Puma argues that in order for an area to be "restricted" within the

meaning of subsections (a)(1) and (a)(2), the Secret Service must so designate it, and that the

Secret Service did not designate the Capitol building and grounds on January 6, 2021.  Def. Mot.

at 17-20.  He next argues that the area in question does not meet the statutory definition of a

"restricted building or grounds" because Vice President Pence and Vice President-elect Harris

were not "temporarily visiting."  Id. at 20-23.  The Court disagrees on both counts.

### A.  Section 1752 Does Not Require that the Secret Service Restrict the Area

According to Mr. Puma, "a plain reading" of the statute suggests that "[s]ince it is

the Secret Service who protects the President or 'other person,'" as described in

subsections (c)(1)(A) and (B), "it is the Secret Service who must designate the area 'restricted.'"

Def. Mot. at 19.  The Court disagrees.

The text of Section 1752 "is not complex," United States v. Griffin, 2021 WL 2778557 at *3, and it "plainly does not require that the Secret Service be the entity to restrict or cordon off a particular area," United States v. Mostofsky, 2021 WL 6049891, at *13. "[S]omeone can violate the statute by knowingly 'entering without lawful authority to do so in any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting." United States v. Griffin, 2021 WL 2778557 at *3 (quoting Wilson v. DNC Servs. Corp., 417 F. Supp. 3d 86, 98 (D.D.C. 2019)).  The plain language of the statute imposes no limitation whatsoever on which authority restricts the building or grounds.  United States v. Bozell, 2022 WL 474144, at *8. Indeed, "[t]he statute focuses on perpetrators who knowingly enter a restricted area around a protectee, not on how it is restricted or who does the restricting."  United States v. Griffin, 2021 WL 2778557 at *3  "[T]he only reference in the statute to the Secret Service is to its protectees. Section 1752 says nothing about who must do the restricting."  Id. at *4.  Congress chose to delineate the outer boundary of this statute not by who does the restricting but to who is being protected.  "Congress's failure to specify how an area becomes 'restricted' just means that the statute does not require any particular method for restricting a building or grounds."  United States v. McHugh, 2022 WL 296304, at *18.

The fact that Judges Contreras, Bates, Kelly, Boasberg, Mehta, and McFadden all interpreted Section 1752 in the same commonsense manner reinforces the Court's conclusion that there is no hidden, extratextual requirement that the Secret Service restrict an area in order for Section 1752 to apply.  See United States v. Andries, 2022 WL 768684, at *14; United States v. Bozell, 2022 WL 474144, at *8; United States v. McHugh, 2022 WL 296304, at *18; United States v. Nordean, 2021 WL 6134595, at *18; United States v. Mostofsky, 2021 WL 6049891,

at *13; Omnibus Order, <u>United States v. Caldwell</u>, Crim. No. 21-28 (D.D.C. Sept. 14, 2021)

[Dkt. No. 415] at 4; <u>United States v. Griffin</u>, 2021 WL 2778557, at *3-5.  The Court also is not

aware of any other judicial decision that departs from this interpretation.

        The parties in their briefs discuss <u>United States v. Bursey</u>, 416 F.3d 301 (4th

Cir. 2005).  <u>See</u> Gov't Opp. at 29; Def. Reply at 9.  Although that case involved an area

restricted by the Secret Service, it offers little insight or analysis with respect to which entity

may designate an area as restricted.  Mr. Puma is correct that the Fourth Circuit's decision in

<u>Bursey</u> is instructive only on "<u>what manner</u> the area is deemed restricted."  Def. Reply at 9;

<u>United States v. Bursey</u>, 416 F.3d at 307 ("[T]he officers at the perimeters of the area were

sufficient to make it a 'cordoned off' and otherwise restricted area.").  Nonetheless, adopting the

government's straightforward construction of the statutory language of Section 1752 does not

lead to any "absurd result," as Mr. Puma suggests.  <u>See</u> Def. Mot. at 20.

        Mr. Puma describes a hypothetical whereby "anyone claiming to be a part of law

enforcement could post a sign designating an area as restricted and a criminal defendant could

then be penalized for trespassing because they 'willfully' ignored the sign."  Def. Mot. at 20.

But an individual only violates Section 1752 by entering or remaining in a restricted area

"without lawful authority to do so," 18 U.S.C. § 1752(a)(1), or "with intent to impede or disrupt

the orderly conduct of Government business or official functions," <u>id</u>. § 1752(a)(2).  The Court's

construction does not create the opportunity for "anyone claiming to be a part of law

enforcement" to manufacture a violation of Section 1752(a) because it would be difficult, if not

impossible, to fabricate these other elements of the offense.  "[T]here is nothing absurd about

criminalizing the breach of any barrier around a Secret Service protectee, and the Court will not

create its own atextual absurdity based on a fringe hypothetical that does not even remotely resemble the facts before the Court."  United States v. McHugh, 2022 WL 296304, at *20.

Mr. Puma asks the Court to consider the history of Section 1752, which, he contends, "bolsters" his preferred interpretation.  Def. Mot. at 19.  Here, the statutory text "has a plain and unambiguous meaning with regard to the particular dispute in this case," Robinson v. Shell Oil Co., 519 U.S. at 340, so there is no need to "look beyond the text for other indicia of Congressional intent," United States v. Villanueva-Sotelo, 515 F.3d 1234, 1237 (D.C. Cir. 2008). Even if the Court considers this history, however, it does not illuminate any requirement for the Secret Service to have restricted the area.  The legislative history of Section 1752 fails to support Mr. Puma's theory.

As Judge McFadden has explained, the statute previously authorized the Treasury Department – which, until 2003, housed the Secret Service – "to 'designate by regulations the buildings and grounds which constitute the' protected residences or offices of Secret Service protectees and 'prescribe regulations governing ingress or egress to . . . posted, condoned off, or otherwise restricted areas where' protectees were present." United States v. Griffin, 2021 WL 2778557, at *4 (quoting 18 U.S.C. § 1752(d) (1970)).  The reference to the Treasury Department and regulations did not include a requirement that the Secret Service must restrict an area covered by Section 1752.  But even if it could be read to suggest something of the sort, "[b]y 2006, Congress rewrote the statute, in the process eliminating reference to the Treasury Department and to any 'regulations' from any executive branch agency." Id. (citing 18 U.S.C. § 1752 (2006)); see also United States v. McHugh, 2022 WL 296304, at *20.  In so doing, Congress "did not replace [that provision] with language limiting the law enforcement agencies allowed to designate a restricted area."  Gov't Opp. at 29.

31

Congress again amended Section 1752 through the Federal Restricted Buildings and Grounds Improvement Act of 2011.  See H.R. 347, 112th Cong. (2012).  The primary purpose of this legislation was to make trespass of the White House and the Vice President's residence a federal crime.  The House Report accompanying H.R. 347 stated that "[c]urrent law prohibits unlawful entries upon any restricted building or ground where the President, Vice President or other protectee is temporarily visiting.  However, there is no Federal law that expressly prohibits unlawful entry to the White House and its grounds or the Vice President's residence and its grounds . . . H.R. 347 remedies this problem."  H.R. REP. NO. 112-9, at 2 (2011) (section entitled "Background and Need for the Legislation.").  This meant that "[p]rior to the 2012 amendments, the 'law prohibit[ed] unlawful entries upon any restricted building or ground where the President, Vice President or other protectee is temporarily visiting,' but the Secret Service was required to rely upon the misdemeanor provisions of the D.C. Code to prosecute someone who trespassed or attempted to trespass on the grounds of the White House or the Vice President's residence."  Opinion, United States v. Jabr, Crim. No. 18-0105 (D.D.C. May 16, 2019) [Dkt. No. 31] at 20.  Although the legislative history of this amendment emphasized the role of the Secret Service in protecting the President and Vice President, Congress made clear that "[t]his bill does not create any new authorities for the Secret Service."  112 CONG. REC. H1,373 (daily ed. Feb. 28, 2011) (statement of Rep. Thomas Rooney).  "Congress' amendment, therefore, was discrete and specific to this gap in federal jurisdiction."  United States v. Jabr, [Dkt. No. 31] at 20.

Mr. Puma invokes a report from the Senate Judiciary Committee, drafted in 1970 when Section 1752 was first enacted, which, he says, "explained that the key purpose of the bill was to provide that authority to the Secret Service."  Def. Mot. at 19 n.8.  While the report does

mention the need for a federal statute "which specifically authorizes [the Secret Service] to restrict entry to areas where the President maintains temporary residences or offices," S. Rep. No. 91-1252, at 7 (1970), it notably does not state that the Secret Service <u>alone</u> would be authorized to designate a restricted area.  To the contrary, the report suggests that Congress enacted Section 1752 with the goal of creating broad federal authority "to protect the physical safety of the President of the United States and the orderly functioning of his Office."  <u>Id</u>. at 3. The report emphasizes that the need to protect the President must be balanced against "possible interference with civil liberties," <u>id</u>., but it does not draw any connection between this concern and limiting the authority to restrict areas to the Secret Service.

The Court agrees with Judge McFadden that the history of amendments to Section 1752 provides little information about who must restrict an area.  <u>See</u> <u>United States v. Griffin</u>, 2021 WL 2778557, at *5.  At the very least, the amendments to Section 1752 have served to increasingly, if only modestly, expand the scope of the statute.  <u>See</u> <u>id</u>. ("[A]t every turn, [Congress] has <u>broadened</u> the scope of the statute."); <u>see also</u> <u>United States v. Jabr</u>, [Dkt. No. 31] at 20 ("[T]he amendments added [in 2012] were intended to expand federal jurisdiction, but in a finite way.").  This history provides no support whatsoever for the notion that there is an extratextual requirement that the Secret Service, rather than some other federal authority, must restrict the area.

In sum, the legislative history, like the plain text of Section 1752, neither states nor clearly implies that the Secret Service alone may designate an area as restricted.

## B.  Secret Service Protectees were "Temporarily Visiting"

Mr. Puma's final argument is that even if the Capitol Police were authorized to restrict the grounds, 18 U.S.C. § 1752 does not apply because then-Vice President Pence and

then-Vice President-elect Harris were not "temporarily visiting" the Capitol building on

January 6, 2021.  Def. Mot. at 20-23.  Mr. Puma argues that because both protectees lived and

worked in the District of Columbia, and both had permanent offices in the U.S. Capitol building,

they did not qualify as "temporarily visiting."  Id.[5]

        Subsection (c)(1) of 18 U.S.C. § 1752 describes three ways in which a "posted,

cordoned off, or otherwise restricted area" may qualify as "restricted":  it may be part of the

White House or its grounds or of the Vice President's official residence or grounds; it may be

part of a building or grounds where the President or other person protected by the Secret Service

is or will be temporarily visiting; or it may be part of a designated special event of national

significance.  United States v. Jabr, [Dkt. No. 31] at 12; 18 U.S.C. § 1752(c)(1)(A)-(C).  The

statute does not define "temporarily visiting," so the Court must determine whether the ordinary

meaning of that phrase is "plain and unambiguous" with respect to the charges in this case.

United States v. McHugh, 2022 WL 296304, at *20-21; see Robinson v. Shell Oil Co., 519 U.S.

at 340.  "Temporary" is commonly understood to mean "[l]asting for a time only; existing or

continuing for a limited time; transitory."  Temporary, BLACK'S LAW DICTIONARY (11th

ed. 2019) (parenthetical omitted).  A "visitor" is "[s]omeone who goes or comes to a particular

person or place," Visitor, BLACK'S LAW DICTIONARY (11th ed. 2019), or, according to the

definition that Mr. Puma cites, "visiting" means "invited to join or attend an institution for a

---

[5]      Mr. Puma argues that the Court should not consider then-Vice President-Elect
Harris in evaluating the sufficiency of the charges pursuant to Section 1752 because the
government "has now filed superseding indictments in numerous cases removing [Vice
President-Elect Harris] from January 6 charges altogether because they learned she was not
present at the joint session"  Def. Reply at 10.  The United States does acknowledge that "Vice
President-Elect Harris . . . was not present at the beginning of the joint session."  Gov't Opp.
at 31.  The Court will not address this question of fact because no party disputes that then-Vice
President Pence, a Secret Service protectee, was present at the U.S. Capitol throughout the time
in question.

limited time," Def. Mot. at 21 (citing <u>Visiting</u>, MERRIAM-WEBSTER DICTIONARY (2021)).  Under

these definitions, Mr. Pence was temporarily visiting the Capitol on January 6, 2021:  he was

there for a limited time only in order to preside over and participate in the Electoral College vote

certification.  <u>United States v. Andries</u>, 2022 WL 768684, at *16.

> Mr. Puma urges the Court to adopt a more restrictive interpretation of

"temporarily visiting" to reach only "temporary travel to a location where the person is not

normally living and/or working on a regular basis."  Def. Mot. at 21.  According to Mr. Puma,

this would exclude time spent in the Capitol building because it "is a federal government

building in the District of Columbia, where both people lived," and "both people actually worked

at the Capitol Building," where they maintained permanent offices.  Def. Mot. at 21.  For

support, he identifies cases that have applied Section 1752 when Secret Service protectees were

"temporarily visiting" locations outside the District of Columbia.  <u>See</u> Def. Mot. at 22.  Mr.

Puma argues that the government conflates the phrase "temporarily visiting" with "physically

present," and asserts that this conflation "read[s] all meaning out of an express limitation."  Def.

Reply at 11.[6]

> Mr. Puma's interpretation is not supported by the statutory text and is out of step

with the statutory context.  The language of the statute is plain: it covers instances where a

protected person "is [currently] temporarily visiting" or "will be temporarily visiting" a

---

[6]     At oral argument, defense counsel also raised a subsidiary argument that
Section 1752 is vague because it fails to put individuals on notice for behavior "within such
proximity to[] any restricted building or ground."  18 U.S.C. § 1752(a)(2).  Defense counsel
expressed concern that this language is not clear enough to form the basis of a criminal
prohibition because "proximity to" obscures the boundaries of what area is restricted.  This
argument fails because the statute clearly requires an individual to "knowingly, and with intent to
impede or disrupt . . . engage[] in disorderly or disruptive conduct."  <u>Id</u>.  The "proximity to"
language merely describes the outer bounds of where a violation may take place.

"restricted building[] or grounds."  18 U.S.C. § 1752(c)(1)(B).  Furthermore, the legislative

history of Section 1752 emphasizes the need for maximum coverage flexibility built into the

statute.  A report from the Senate Judiciary Committee, when Section 1752 was first enacted,

states that "[t]he purpose of [Section 1752] is to protect the physical safety of the President of the

United States and the orderly functioning of his Office by extending additional Federal

protection for certain conduct to his specifically designated temporary residences and offices and

to posted, cordoned off, or otherwise restricted areas where he is or will be visiting."  S. Rep. No.

91-1252, at 3 (1970).  The report describes that the purpose of the amendment adding the

"temporarily visiting" language is to "provide[] for the special case of a temporary Presidential

visit where flexibility must be maintained and there is insufficient time to publicly designate

restricted areas by regulation."  Id. at 2.  The report quotes testimony from the Director of the

Secret Service, who testified before the subcommittee that "the enactment of this legislation is

necessary in order to guarantee the safety of the President when he is temporarily absent from the

Executive residence."  Id. at 7.  This suggests that Congress intended Section 1752 to apply

broadly and comprehensively, reinforcing the security of Secret Service protectees at a number

of locations, and not in the patchwork manner that Mr. Puma suggests.

   The legislative history of the statute's amendments confirms that the statute's

protections encompass places of work and other locations where a protectee may conduct

business.  See 112 CONG. REC. H1,373 (daily ed. Feb. 28, 2011) ("A key component of the

Service's protection mission is securing the buildings and grounds where those protected work or

visit. From the White House to a hotel ballroom, the Secret Service must provide a secure

environment for the President and other protectees.") (statement of Rep. Thomas Rooney)

(emphasis added); see also 112 CONG. REC. H953 (daily ed. Feb. 27, 2012) ("H.R. 347 ensures

that the President, the First Family, the Vice President, and others are protected whether they are in the White House or attending an event in a convention center or meeting hall.") (statement of Rep. Lamar Smith).

Furthermore, if "temporarily visiting" were construed narrowly as Mr. Puma suggests, an individual could violate Section 1752(a) in connection with the official residence of a Secret Service protectee, or at a location that the protectee visits briefly outside of Washington, D.C., but not in connection with any location in Washington, D.C. (other than an official residence) where the protectee maintains an office – unless that location is "restricted in conjunction with an event designated as a special event of national significance." 18 U.S.C. § 1752(c)(1)(C). Mr. Puma's proposed construction would leave an arbitrary gap in the application of the law by excluding such locations from its reach. Nonetheless, even if the Court were to accept Mr. Puma's view that the statute does not cover a protectee "where the person is [] normally living and/or working on a regular basis," Def. Mot. at 21, the statute would still apply. "The U.S. Capitol is not the Vice President's regular workplace, nor was Vice President Pence's trip to the Capitol on January 6, 2021 analogous to a regular commute to the office." United States v. McHugh, 2022 WL 296304, at *22. Despite having formal office space set aside at the U.S. Capitol, "the Vice President is principally an executive officer who spends little time at the Capitol and likely even less in her 'office' there." Id; accord United States v. Andries, 2022 WL 768684, at *17 ("Like a President who maintains an office at his home-state residence, and like the CEO who maintains a reserve office at her firm's satellite location, Vice President Pence held an office at the Capitol, but did not use that office as his primary, regular workspace.").

The much more sensible reading is that subsection (c)(1)(B) applies to those areas not covered by subsections (c)(1)(A) and (c)(1)(C) where a Secret Service protectee may nonetheless face security risks.  As evidenced by the legislative history, the goal of Section 1752 is to provide the fullest protection possible for Secret Service protectees.  Sections 1752(c)(1)(A) and (c)(1)(C) specifically carve out the White House and its grounds, the Vice President's official residence and its grounds, and special events of national significance.  It thus is entirely logical that, but for those locations carved out in subsections (A) and (C), all other areas are covered by subsection (c)(1)(B) to avoid potential vulnerabilities for protectees.  Under this reading of Section 1752, the statute would cover any place a protectee may visit on a given day, whether it be an airport hangar in South Carolina, see United States v. Bursey, 416 F.3d at 304, a meeting at a federal agency in Washington, D.C., a meal at a local restaurant, or the U.S. Capitol.

Another sensible interpretation of Section 1752 would be to read subsection (c)(1)(B) to designate "restricted buildings or grounds" as anywhere "where the President or other person protected by Secret Service is" or anywhere "where the President or other person protected by the Secret Service . . . will be temporarily visiting."  18 U.S.C. § 1752(c)(1)(B) (emphasis added).  Under this interpretation, the Court does not have to define "temporarily visiting" to conclude that the statute applies to Mr. Puma's alleged conduct.  This interpretation creates protection around the protectee's physical location, anywhere that might be, as well as all future locations that need to be secured in advance of a protectee's visit. Accordingly, because Vice President Pence was physically present at the U.S. Capitol on January 6, 2021, the U.S. Capitol was automatically designated as a "restricted building or ground" during the relevant period.

Under either interpretation of the statute, the U.S. Capitol was clearly covered by the definition of "restricted buildings or grounds" under 18 U.S.C. § 1752 during the time of Mr. Puma's alleged criminal conduct.

V.  CONCLUSION

For the reasons set forth above, it is hereby

ORDERED that Mr. Puma's Motion to Dismiss Counts One, Two, and Three of the Indictment [Dkt. No. 20] is DENIED.

SO ORDERED.

_____
/s/
PAUL L. FRIEDMAN
United States District Judge

DATE:  March 19, 2022