## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:21-cr-454-PLF** |
| **ANTHONY PUMA,** | |
| **Defendant.** | |

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government respectfully requests that this Court sentence Anthony Puma to 18 months of imprisonment, at the midpoint of the applicable advisory Guidelines range; three years of supervised release; $2,000 in restitution; and a mandatory assessment of $100.

### I.    INTRODUCTION

The defendant, Anthony Puma, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential Election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1]    As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On December 31, 2020, one week before the January 6, 2021 attack on the United States Capitol, Puma laid out his plan in a Facebook post: "On the 6th when we are all there in the capital [sic] and he [former President Trump] is givin [sic] his second term the people will see.   Then you never know we might have to start killing some commie bastards.  #stopthesteal."   On January 5, 2021, Puma again took to Facebook to reiterate his plan, this time in a message to a friend: "Tomorrow is the big day.   Rig for Red.   War is coming."   Later that evening, after arriving in Washington, D.C., Puma posted in a Facebook comment, "What time do we storm the House of Representatives?"   An hour later, Puma answered his own question, "Hopefully we are storming the House of Representatives tomorrow at 100pm."

On January 6, Puma made good on his plan.   He strapped a Go-Pro camera to his head, activated the camera's recording feature, and marched from his hotel near Freedom Plaza to the Capitol.   After entering the Capitol's restricted area, Puma approached a wall on the Capitol's west side and urged other rioters in front of him to move forward and clear the way for others attempting to scale the wall.   Minutes later, Puma scaled a different wall near the Capitol's north side, made his way to the Senate Wing Door, and entered the Capitol building through a shattered window.   Once inside, Puma walked around the building and into Senator Merkley's office (among other locations), where he asked if he could join other rioters in smoking marijuana.   After exiting the Capitol building (as the officers funneled the crowd out), Puma posted a video on Facebook in which he boasted: "We got tear gassed.   Now we just tried storming it again and we got pepper sprayed."   Puma then remained on Capitol grounds until nighttime, as officers, in Puma's words to the FBI, "kept pushing us further and further back."   On January 10, 2021, Puma issued an ominous warning to a friend on Facebook, "Watch what is to come in the next two weeks

2

to month.   It will shock the world."

The government recommends that the Court sentence Puma to 18 months' incarceration, which is within the advisory Guidelines range of 15 to 21 months stipulated by the parties in their plea agreement, and which the government submits is the correct Guidelines calculation.   An 18-month sentence reflects the gravity of Puma's conduct, but also acknowledges his admission of guilt once he was contacted by the FBI.

II.     FACTUAL BACKGROUND

A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 48, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 Presidential Election.

B.     Puma's Role in the January 6, 2021 Attack on the Capitol

Anthony Puma, a resident of Brownstown Township, Michigan, participated in the January 6 attack on the Capitol.   His crimes are documented through a series of videos Puma recorded using a Go-Pro camera, cell-phone videos Puma livestreamed on Facebook, surveillance footage from inside of the Capitol, and Puma's Facebook postings.

*Puma's Approach to the Capitol*

Puma traveled to Washington, D.C. from his home in Michigan on January 5, 2021 with a friend, R.A., and two of R.A.'s associates.   Puma's friend rented the car in which the group rode and reserved a room for the group at a hotel near Freedom Plaza in Washington, D.C.

On January 6, Puma woke up in the early afternoon.   By then, people who had attended

the Stop the Steal rally at the Ellipse had started to march towards the Capitol.   Puma strapped a Go-Pro camera to his head and joined the crowd, marching towards the Capitol on Pennsylvania Avenue.   He wore a camouflage jacket, a red vest with a hood, a baseball cap, and black gloves. Along the way, Puma heard that the Capitol had been breached.   Puma's own Go-Pro footage shows a group of rioters riding on a motorized cart announcing, "We are inside, they need help" and "Let's go, we're inside; we've breached the Capitol":



*Video Still from Ex. 1 at 00:41 (Puma's Go-Pro view)*

Within minutes, Puma entered the Capitol's restricted area.   As Puma approached the Capitol building, his Go-Pro camera recorded footage of several individuals—all wearing helmets, goggles and/or respirators, and other tactical gear, and some marked by green tape—as they moved in a line formation towards the Capitol:



*Video Still from Ex. 1 at 07:29 (Puma's Go-Pro view)*

Despite these clear indications that the attack on the Capitol had turned violent, Puma marched on.   Within minutes, he reached a wall at the north end of the steps leading up to the Capitol's Upper West Terrace.   There, he encouraged the rioters in front of him to move forward

and scale the wall with a makeshift ladder:



*Video Still from Ex. 2 at 4:31 (Puma's Go-Pro view)*

Puma also urged the rioters in front of him to make way for those waiting behind, so more rioters could scale the wall and reach the Capitol building.   As he stood by the wall, Puma told other rioters, "This is gonna happen, boys.   [Expletive.]   Imagine if we were armed."   Ex. 2 at 2:46 – 2:55.

Puma ultimately scaled a different wall, on the north side of the Capitol, and made his way to the Upper West Terrace.   By then, Puma was aware that D.C. Mayor Muriel Bowser had issued a curfew, directing all individuals to return to clear the streets by a specific time that evening.   Ex.

3 at 2:00 – 2:20.   Puma told other rioters in the mob that he was going to ignore the curfew, stating, "I just scaled that [expletive] wall."   *Id.*   He also said, "They probably evacuated everybody already here."   *Id.* at 1:50 – 2:00.

### *Puma's Breach of the Capitol*

Within minutes, Puma reached the Senate Wing Door.   As he stood near that entry point, he declared, "Storming!"   Ex. 3 at 3:01.   At 3:10 p.m., Puma entered the Capitol building by jumping through a shattered window:





*Video Still from Ex. 3 at 3:35 (Puma's Go-Pro view)*     *Video Still from Ex. 4 at 3:10:43 p.m. (CCTV, zoomed)*

As he did so, Puma boasted: "There you go.   Right through the [expletive] window.   That's how we do it."   Ex. 3 at 3:25 – 3:30

Puma then marched through a corridor toward the Crypt of the Capitol.   Along the way, he chanted, "It's our House."   Ex. 3 at 4:09.   And along the way, he also entered Senator Merkley's office, where other rioters were smoking marijuana:



*Video Still from Ex. 3 at 4:32 (Puma's Go-Pro view)*

Puma asked if he could join them, "Are you sharing?"   Ex. 3 at 4:20 – 4:50.[2]

Puma next took another detour, this time to enter another Congressional room (S145) where other rioters were congregating:

---

[2]      It does not appear that Puma actually used marijuana in Senator Markley's office.



*Video Still from Ex. 3 at 6:13 (Puma's Go-Pro view)*

Once inside, Puma asked those rioters, "Is this our room?   Is this one of our rooms? … It is now, that's right."   Ex. 3 at 5:50 – 6:00.   Only moments earlier, in response to being told by another rioter that "SWAT" was responding to the Capitol, Puma had stated, "That's a lie."   Ex. 3 at 5:20 – 5:30.   Once inside the conference room, Puma again dismissed the notion that rioters might be arrested, "They ain't got enough space for everybody."   Ex. 3 at 6:00 – 6:15.

Puma next went to the Crypt of the Capitol, where he spent several minutes:

 

*Video Still from Ex. 5 at 0:33 (Puma's Go-Pro view)*   *Video Still from Ex. 5 at 1:25 (Puma's Go-Pro view)*

*See* Ex. 5 at 0:01 – 6:00.

Puma then exited the Capitol building at approximately 3:23 p.m., as Capitol Police officers funneled him and other rioters who had congregated around the Senate Wing Door lobby toward the exit:

 

*Video Still from Ex. 4 at 3:22:47 p.m.*
*(CCTV, zoomed)*   *Video Still from Ex. 5 at 7:35 (Puma's Go-Pro view)*

*See* Ex. 4 at 3:21:25 p.m. – 3:23:00 p.m; Ex. 5 at 6:30 – 9:00.

### *Puma's Stay on Capitol Grounds*

After exiting the Capitol building, Puma again dismissed the idea of complying with the curfew imposed by D.C. authorities.   Instead, he spent at least one more hour on the Upper West

10

Terrace and other parts of the Capitol grounds.   As Puma put it when he was interviewed by the FBI, he remained on Capitol grounds until "nighttime," as officers "kept pushing us further and further back."   As he did so, Puma livestreamed multiple videos using his cell phone.



*Video Still from Ex. 6 at 0:14 (Puma's livestream)*

In these late afternoon videos, Puma looked straight into the camera and launched into increasingly incendiary rhetoric.   In one video, Puma declared: "We got tear gassed.   Now we just tried to storm it again, and we got pepper sprayed."   Ex. 6 at 0:01 – 0:10.   Referring to a line of police officers visible nearby, Puma said, "Look at these stormtroopers. … They don't want freedom."   *Id.* at 0:10 – 0:20.   He then added, "This is America.   We knew this election was stolen."   *Id.* at 0:45 – 0:50.   In another video, Puma stated, "We are gonna wait.   We are gonna wait until it's dark.   They already evacuated all the senators and congressmen. … This is our Capitol, people.   This is our [expletive] House."   Ex. 7 at 0:01 – 0:30.   He also boasted, "I scaled this wall … It's on my Go-Pro."   *Id.* at 1:00 – 1:10.

Later that evening, a Facebook friend of Puma's posted a comment that he had a "buddy

11

who was there, recording the activities on live stream the whole time."   Puma's Facebook friend

posted what appears to be a screenshot of a livestream event showing a police line with shields.

Comments visible on the livestream indicate that Puma was, indeed, responsible for posting this

livestream:



*Facebook record*

### *Puma's Social Media Statements*

The government obtained a search warrant for Puma's Facebook account.   A review of

the recovered material revealed that, long before January 6, Puma subscribed to various conspiracy theories regarding the 2020 Presidential Election; he traveled to Washington, D.C. determined to impede the certification of the Electoral College vote and prepared to commit violence; and, in the days following January 6, he had no remorse for his participation in the riot.

For instance, on November 7, 2020, four days after the 2020 Presidential Election, Puma posted a message on Facebook:

**Time** 2020-11-07 22:01:53 UTC
**Message** THE MEDIA DOES NOT ELECT THE PRESIDENT. Remember these dates. Dec 6, 8, 14. This is facts. Republicans control the faction. You'll see.

A few days later, on November 11, 2020, he sent a message to a Facebook friend, "So many unsolicited ballots.   To[o] many dead and illegals voted."   By December 30, 2020, Puma was overtly pointing to January 6 as the date when the result of the 2020 election would be overturned, by violent means if necessary: "On the 6th when we are all there in the capital and he [former President Trump] is givin (sic) his second term the people will see.   Then you never know we might have to start killing some commie bastards.   #stopthesteal."

As January 6 approached, Puma's calls for violence and civil unrest escalated.   On January 5, 2020, Puma posted a picture to his Facebook account of a crowd of people carrying Trump signs or flags:



When a Facebook friend expressed admiration, Puma wrote, "Thank you.   Tomorrow is the big day.   Rig for Red.   War is coming."   Later that day, Puma made clear that the attack would "hopefully" involve the takeover of Congress.    In the night between January 5 and 6, Puma posted to his Facebook account:

| Time | |
|---|---|
| | 2021-01-06 05:02:30 UTC |
| Type | Comments |
| Summary | Anthony Puma commented on a post from January 5. `We are here. What time do we storm the House of Representatives?` ` |
| Object Id | S: I1074963367:107496714519879:26 |

(Emphasis added).   Within an hour, Puma answered his own question:

| | |
|---|---|
| **Time** | 2021-01-06 06:01:12 UTC |
| **Type** | Comments |
| **Summary** | Anthony Puma commented on a post from January 5. `Hopefully we are storming the House of Representatives tomorrow at 100pm.` |
| **Object Id** | S: |1074963367:107496714519879:27 |

(Emphasis added).

In the hours and days immediately following January 6, Puma did not manifest any regret over his participation in the riot.   To the contrary, he repeatedly celebrated the civil unrest and shifted blame to law enforcement and Antifa.   In the evening of January 6, for example, Puma posted a sequence of comments to this Facebook account:

> They [expletive]  killed people today.   We are pissed.   Where [expletive] were you.   We are pissed.
> …
> [W]e didn't shoot.   They shot at us and killed a girl.   We were unarmed.   They are lying to you as they always do.   I was there right in the front lines.
> …
> I was there.   We were not violent till they (officers) started.   We're [sic] those antifa that started the storm I don't know.   But bus loads were dropped off here last night.   Yes they were dressed just like us, just like we can't tell if you're a commie.

On January 10, 2021, Puma ominously warned a Facebook friend, "Watch what is to come in the next two weeks to month.   It will shock the world."   He then added, "Get prepped.   Rig for Red."   When Puma's friend asked for clarification, Puma responded, "Arm up bu[d]. … Get read[y] for martial law."

### Puma's Interviews with the FBI

On January 14, 2021, FBI agents visited Puma at his residence.   Puma voluntarily agreed to be interviewed, and was interviewed, by the FBI about his participation in the January 6, 2021 attack.   At the time, Puma also voluntarily provided footage from his Go-Pro camera.   Puma also

agreed to be interviewed by the FBI when he was arrested on May 27, 2021. Puma was interviewed again by the FBI on August 25, 2022 as part of his plea agreement.

### III.    THE CHARGES AND PLEA AGREEMENT

On July 7, 2021, a federal grand jury returned a five-count indictment charging Puma with obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count One); entering and remaining in a restricted area or grounds, in violation of 18 U.S.C. §1752(a)(1) (Count Two); disorderly or disruptive conduct in a restricted area or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three); disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Four); and parading, demonstrating, and picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Five).   On August 30, 2022, Puma pleaded guilty to Count One of the indictment pursuant to a plea agreement.

### IV.    STATUTORY PENALTIES

Puma now faces sentencing on Count One of the indictment: obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2).   As noted in the plea agreement and the Presentence Report issued by the U.S. Probation Office, Puma faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.   In addition, as part of the plea agreement, Puma has agreed to pay $2,000 in restitution.

### V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines

should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.   The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing.   *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the Probation Office calculated Puma's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2J1.2(a)) | 14 |
| Specific Offense Characteristics (U.S.S.G. § 2J1.2(b)(2): substantial interference with the administration of justice) | 3 |
| Acceptance of Responsibility (USSG § 3E1.1(a)) | -2 |
| Prompt Guilty Pea (USSG § 3E1.1(b)) | -1 |
| **Total Adjusted Offense Level** | **14** |

*See* PSR at ¶¶ 29-39.

The Probation Office calculated Puma's criminal history as a category I, which the government does not dispute.   PSR at ¶¶ 41-50.   Although Puma has been convicted of numerous criminal offenses—trespassing (1990), possession of marijuana (1990), possession of an illegal weapon (1990), disturbing the peace (1993), assault and battery (1993), larceny (1997), assault and battery (1998), failure to pay child support (2004), and attempted delivery/manufacturing of marijuana (2008)—those convictions did not result in criminal-history points under the Guidelines because they occurred beyond the look-back periods of Guidelines § 4A1.2(e).   PSR at ¶¶ 41-50. Accordingly, the Probation Office has computed an advisory Guidelines range at 15 to 21 months

17

of imprisonment.   PSR at ¶ 108.   Puma's plea agreement contains an agreed-upon estimated Guidelines calculation that mirrors the Probation Office's calculation.   Plea Agreement at 3-4.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).   As described below, on balance, the Section 3553(a) factors weigh in favor of a substantial term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Puma's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification of the Electoral College vote from being carried out, frustrating the peaceful transition of presidential power, and throwing the United States into a constitutional crisis.   The nature and circumstances of Puma's offense were of the utmost seriousness, and fully support the government's recommended sentence of 18 months of imprisonment.

### B.     The History and Characteristics of the Defendant

Puma's offense on January 6 was not an isolated event in an otherwise law-abiding life. As noted, Puma has several prior adult criminal convictions, including (i) a 1998 conviction in Michigan state court for assault and/or battery and stalking, which stemmed from Puma's abuse of his domestic partner at the time; and (ii) a 2008 conviction for attempting to manufacture/deliver marijuana, which stemmed from Puma's marijuana-growing activities.   PSR at ¶¶ 47, 49.   In addition, in 2000 and 2001, Puma was charged for obstructing police (twice) and with obstructing justice.   PSR at ¶¶ 60-61.   Although Puma's prior convictions and arrests are not recent, they demonstrate a propensity to disregard the law.   Puma's derisive statements, on January 6, about the curfew imposed by D.C. authorities and about the officers who were attempting to restore

18

peace and order to the Capitol reinforce the same concern.   Puma's history and characteristics therefore weigh in favor of a substantial term of incarceration.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Puma's criminal conduct—which included a premeditated and corrupt effort to obstruct Congress' certification of the Electoral College vote, scaling a wall to reach the Capitol building, breaking into the Capitol building through a shattered window, invading a Senator's office space and attempting to smoke marijuana in that office, filming the day's exploits on a Go-Pro camera, remaining on Capitol grounds until evening, and boasting about it on social media—was the epitome of disrespect for the law.

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.   First, although Puma has a criminal

---

[3]       *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

history category of I, his history of arrests and convictions shows a troubling pattern of recidivism. Second, although Puma agreed to be interviewed by the FBI when the agents visited his residence in mid-January 2021 (and then upon being arrested and as part of his plea agreement), his social media statements immediately after January 6 were those of a man girding for another battle.   *See United States v. Matthew Mazzocco*, 1:21-cr-54 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol.   It didn't come when he went home.   It came when he realized he was in trouble.   It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day.   It came when he realized that he could go to jail for what he did.   And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).   Puma's statements, after January 6, that "martial law" was coming, that his friend should "arm up," and that new (unspecified) developments would "shock the world" demonstrate that Puma's sentence must be sufficient to provide specific deterrence from committing future crimes of a similar nature.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."   *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience,

guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards."   *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts must give "respectful consideration to the Guidelines."   *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."   *Gall v. United States*, 552 U.S. 38, 54 (2007).   In short, "the Sentencing Guidelines are themselves an anti-disparity formula."   *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021).   Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.   *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).   After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing

judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).   The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."   *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).   "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."   *Id*. at 1095.   "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly."   *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009).   *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

---

[4]     If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct.  *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

This Court may consider, for reference, the sentence imposed in *United States v. Tommy Fredrick Allan*, No. 21-cr-64 (CKK).   Like Puma, Allan pleaded guilty to one count of obstruction of an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2.   Like Puma, before arriving in Washington, D.C., Allan posted messages to social media embracing conspiracy theories about the 2020 election and urging action to prevent the transfer of power.   Like Puma, Allan became aware of rioters breaching the Capitol as he was making his way to the Capitol yet chose to join them to "storm" the building himself.   Like Puma, Allan climbed a wall on the side of the Capitol to make his way into the building.   Like Puma, Allan roamed the halls of the Capitol for approximately 15 minutes.   Similarly to Puma's conduct in the late afternoon of January 6, Allan also joined a group of rioters near the front lines of the confrontations with police officers. Like Puma, Allan boasted about his exploits on Facebook.   And although Allan's conduct included some aggravating factors not present here,[5] Puma, unlike Allen, remained on the Upper West Terrace until nighttime, as officers "kept pushing us further and further back."   Puma also entered the Capitol building through a shattered window—not a door—and bragged about that mode of entry.   And Puma continued making ominous threats about political violence in his social media messages after January 6.   Judge Kollar-Kotelly sentenced Allan to 21 months of imprisonment, to be followed by 3 years of supervised release.   A comparable sentence of 18

---

[5]     While inside the Capitol, Allan stole an American flag, as well as documents he took from the Senate Chamber.   Allan also destroyed the documents he had stolen in an effort to hide evidence of his crimes.   Differently from Puma, Allan declined to be interviewed by the FBI.

months of imprisonment, to be followed by 3 years of supervised release is warranted—but no greater than necessary—on the similar facts of this case.

This Court may also consider the sentence imposed in *United States v. Andrew Alan Hernandez*, No. 21-cr-445 (CKK).   Like Puma and Allan, Hernandez pleaded guilty to one count of obstruction of an official proceeding.   On January 6, Hernandez made his way to the Capitol grounds and, from there, to the East Plaza, where he positioned himself close to the front of the crowd trying to enter the Capitol building.   After other rioters opened the East Rotunda doors from the inside, Hernandez entered the Capitol building and then proceeded to the Senate Gallery, where he took celebratory "selfies."   While Hernandez's entry into the Senate Gallery is an aggravating factor that is not present here, Puma's conduct was significantly more culpable in several important respects.   Unlike Hernandez's, Puma's pre-January 6 social-media posts revealed a distinct, well-articulated objective that the events of January 6 would result in the takeover of the Capitol.   Unlike Hernandez, before he entered the Capitol building on January 6, Puma had ample notice that the Capitol had been breached and that military-style formations were involved in the attack.   Unlike Hernandez, Puma ensured that his exploits would be as thoroughly documented as possible, first by recording them with a Go-Pro camera strapped to his head and then by livestreaming on Facebook.   Finally, unlike Hernandez, Puma remained committed to the mob's takeover of the Capitol well into the late afternoon of January 6—until nighttime—retreating only as officers kept pushing the rioters further and further back.   Judge Kollar-Kotelly sentenced Hernandez to 18 months of imprisonment, to be followed by 3 years of supervised release.   Puma's conduct warrants a sentence that is at least as severe as the one imposed in *Hernandez*.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[6]   *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).   Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).   At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3).   *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Puma must pay $2,000 in restitution, which reflects in part the role Puma played in the riot on January 6.[7]   Plea Agreement at 8.   As the plea agreement reflects, as of April 5, 2022, the riot at the United States Capitol had caused approximately $2,734,783, a figure based on loss estimates supplied by the Architect of the Capitol.   *Id.* Since Puma pleaded

---

[6]      The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here.   *See* 18 U.S.C. § 3663A(c)(1).

[7]      Unlike under the Sentencing Guidelines for which the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA.   *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

guilty in August 2022, that figure has increased to approximately $2,881,360.    Puma's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.   *See* PSR ¶ 113 & n.4.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 18 months of imprisonment, at the midpoint of the applicable advisory Guidelines range; three years of supervised release; $2,000 in restitution; and a mandatory assessment of $100.

February 8, 2023                        Respectfully submitted,

                                        MATTHEW M. GRAVES
                                        UNITED STATES ATTORNEY

                                        By:    */s/ Francesco Valentini*
                                        Francesco Valentini
                                        D.C. Bar No. 986769
                                        Trial Attorney
                                        United States Department of Justice, Criminal Division
                                        Detailed to the D.C. United States Attorney's Office
                                        601 D Street NW
                                        Washington, D.C. 20530
                                        (202) 598-2337
                                        francesco.valentini@usdoj.gov