**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **Anthony Puma** | ) | **Case No. 1:21-cr-454-PLF** |
| _____ | ) | |

## DEFENSE OPPOSITION TO APPLICATION FOR ACCESS TO VIDEO EXHIBITS

Anthony Puma, through undersigned counsel, respectfully moves this Court to deny the petitioner's application for access to video exhibits it filed in this matter on February 9, 2023. *See* ECF No. 57. Its petition relies on a Standing Order issued in Case No. 21-mc-46, in which the Chief Judge Beryl A. Howell granted in part and denied in part the attempt of fourteen media organizations to obtain a blanket order to obtain all judicial records in all January 6 cases. *See* ECF No. 8, Memorandum Opinion (herein after "Standing Order").

Prior to issuing the Standing Order, the Chief Judge gave the Office of the Federal Public Defender ("FPD") an opportunity to provide its position, which it did on May 7, 2021. *See* ECF No. 6. It responded with a request that the court refrain from issuing a blanket order in all January 6 cases giving unfettered access but rather proposed that the decision should be made by each individual judge on a case by case basis. *Id*. In support of this position, the FPD argued that there could be

1

reasons to deny such an application in a case where prejudice would result and so to protect the rights of each criminal defendant, a case by case determination would be more appropriate. *Id*. However, the FPD conceded that in cases where there is no opposition, it had no objection to a streamlined approach to ensure the media had expeditious access to exhibits in uncontested cases. *Id*.

To date, the District of Columbia FPD, including undersigned counsel, has not opposed a single media application by the petitioner despite its handling of several January 6 cases where applications were made.[1] In this matter, however, there are extraordinary circumstances that require an opposition. Mainly, Mr. Puma's livelihood, and ability to be gainfully employed will undoubtedly be in jeopardy if the media releases the video exhibits in this case to the public.

## I.   <u>Governing Authority</u>

The Supreme Court has recognized that the public has a general right to inspect and copy public records and documents, including judicial records and documents. *Nixon v. Warner Commc'ns*, 435 U.S. 589 (1978).  In light of this general right, there is a "strong presumption in favor of public access of judicial proceedings, including judicial records. *Id.*  However, the D.C. Circuit has

---

[1] However, in *United States v. Munchel*, 567 F.Supp.3d 9 (D.C. Cir. 2021), the FPD joined the government's opposition to public access to videos filed in a detention hearing. The government later withdrew its objection, and the FPD, in oral argument, joined the co-defendant in not opposing "access" to the videos but rather simply opposing the media re-broadcasting the videos to the public. As such, the FPD never filed a brief opposing the media application requesting public access to video exhibits. Furthermore, another FPD office in Pennsylvania opposed a similar request in *US v. Kyle Fitsimons*, 21-mc-090 (RC), but for completely different reasons – essentially that the release would prejudice the defendant's defense at trial.

recognized that the presumption may be outweighed by competing interests. *In Re Leopold*, 964 F.3d 1121, 1127 (D.C. Cir. 2020).

With regard to judicial records that are subject to a sealing order, the D.C. Circuit Court has instructed courts to use the test set forth in *United States v. Hubbard,* 650 F.2d 293 (D.C. Cir. 1980), when deciding whether these judicial records should be made available to the public by the Court. This balancing test assesses the following factors: "(1) the need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure, and the identity of that person; (4) the strength of any property and privacy interests asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced during the judicial proceedings." *Leopold v. United States*, 964 F.3d 1121, 1131 (D.C. Cir. 2020) (quoting *Metlife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 665 (D.C. Cir. 2017)).

## II.   The *Hubbard* Factors Warrant Denial of Public Access Of Sentencing Video Exhibits in this Case

When analyzing the factors set forth in *Hubbard*, the likelihood of substantial prejudice to Mr. Puma greatly outweighs the generalized interests in public access to these specific video exhibits. While Mr. Puma understands there is a presumption in favor of public access, counsel for Mr. Puma submits that the presumption is rebutted in this matter.

### a.  The need for public access to the documents at issue

As an initial matter, before the unprecedented prosecution of 900 and
counting January 6 cases, trials and sentencings were not broadcasted to the media
in federal court. The media has always had access to these hearings and can attend
– however the firm rule that these hearings cannot be recorded exists for a reason.
The fact that in cases like Mr. Puma's, the videos are attached as exhibits, does not
change this fact and the media should not have an unfettered right to obtain all
videos and re-broadcast them at its pleasure simply because it is a January 6 case.[2]
The media has had almost unfettered access to all video exhibits filed in January 6
cases for almost two years now – regardless of any particularized interests in the
specific defendants in each case. As a result, several national and local newspapers
have been able to publicly release clips of videos for the world to see, choosing the
specific clips of larger videos at the author's discretion.

The interest in Mr. Puma, specifically, cannot be anything more than a
"general" interest as there is nothing in particular about his case that is any
different than the average January 6 case that warrants a particular "need" for
these video exhibits. In fact, the local news outlets in Michigan, where Mr. Puma
resides, are the only outlets that have released stories focusing on Mr. Puma's case.[3]

---

[2] This begs the question as to whether such broad access could give the media the ability to
request all exhibits introduced at a trial, usually hundreds of exhibits admitted into
evidence. The assumption is that the line would be drawn after such a request.

[3] *See* Snell, Robert, *Metro Detroit man charged with breaking into Capitol*, The Detroit
News, May 27, 2021, available at
https://www.detroitnews.com/story/news/local/michigan/2021/05/27/anthony-puma-charged-
breaking-into-capitol-during-jan-6-riot/7467940002/; Golston, Hilary, *Brownstown
Township man faces federal charges for taking part in Jan. 6 Capitol riot*, Fox 2, May 28,
2021 available at https://www.fox2detroit.com/news/brownstown-township-man-faces-
federal-charges-for-taking-part-in-jan-6-capitol-riot; Oliver, Joey, 9th *Michigan Man*

The petitioner here represents several *national* news outlets who have not expressed any interest in Anthony Puma before now. Based on just a "general" interest, this favor weighs in favor of Mr. Puma and the "purposes of public access are only modestly served" by having access. *Hubbard*, 650 F.2d at 318.

Most importantly, the public has had access to all other court documents filed in this matter, including several pre-trial motions, and sentencing memoranda. The extent of material the public already has access to diminishes any "need" for access to a few exhibits in this matter.

### b. The extent of previous public access to the documents

Previous access is a factor which may weigh in favor of subsequent access. *Id.* In this matter, only a few photographs/screenshots of the video exhibits have been released publicly. For that reason, there is no previous access to weigh in favor of the public release of these videos now. *Id.* at 319. Now, the government alleges in this matter that at some point, Mr. Puma live-streamed, on Facebook, his Go-Pro footage while at the Capitol building. However, it is unclear as to whether or not that in fact occurred, and if it did, to what extent. Nonetheless, even if it did occur, the livestreaming was brief and certainly not the two hours plus video that is captured in the government and defense video exhibits that the petitioner now seeks. Lastly, even if some portion of the livestreaming existed on Facebook, it has

---

*Charged in Capitol Breach Case*, Patch, May 28, 2021, available at
https://patch.com/michigan/detroit/9th-michigan-man-charged-capitol-breach-case; Johncox, Cassidy, *14 Michigan men charged in Jan. 6 insurrection: What we know, Click on Detroit*, January 6, 2022, available at https://www.clickondetroit.com/news/michigan/2022/01/06/13-michigan-men-charged-in-jan-6-insurrection-what-we-know/

not been available for 2 years and there is no indication that any news outlet has ever released it.

### c. The fact that someone has objected to disclosure, and the identity of that person

The fact that the individual defendants in *Hubbard* objected to public access was an "important consideration" to the court. *Id*. Here, Mr. Puma has timely made his objection to disclosure of the requested information and for that reason, his objection to access weighs in favor of non-disclosure. *Id*. at 320.

### d. The strength of any property and privacy interests asserted

This factor in *Hubbard* arose based on different considerations as the information sought in that case were church documents containing third party information and where disclosure would have interfered with the Church's procedural rights. *Id*. However, the same general privacy concerns can be asserted in this matter as disclosure of most of the video exhibits here contain audio, which captures many statements made by Mr. Puma over the course of the day on January 6, 2021, some of which were made in private and in a private setting (not at the Capitol grounds or building). Moreover, many of these statements are not relevant to the overall allegations or the Court's consideration at sentencing as the full length and unedited videos were given to provide the full context for the Court.

### e. The possibility of prejudice to those opposing disclosure

The prejudice that would result to Mr. Puma if the media were to release these video exhibits to the public would be substantial and would outweigh any "general" public access interests. Mr. Puma has already been terminated from two

places of employment due to media coverage of his involvement on January 6, 2021. That media coverage did not contain actual videos of Mr. Puma but was still sufficient to cause his employers to fire him – placing his livelihood at risk and his ability to support his family at risk. If actual videos of him on January 6 were to be released, he would likely again lose his stable job that puts food on the family table and pays the bills. Furthermore, full access would allow the media to clip these larger videos showing the most egregious behavior – which does not show the full context of his conduct as the parties have tried to portray so that the Court can make an informed decision at sentencing. These clips will likely dramatize Mr. Puma's overall conduct and will unfairly prejudice him and will likely cause public and financial ruin. *Id*. at 321 ("the likelihood of prejudice will in turn depend on a number of factors, including, most importantly, the nature of materials disclosed"); *See also In re Nat. Broad. Co., Inc.*, 653 F.2d 609, 620 (D.C. Cir. 1981) (public access not favored when disclosure would expose defendant to "public humiliation and degradation.")

The right of public access is not intended to be needless punishment for a criminal defendant who has already been punished severely from constant media coverage. The media has access to court documents, sentencing filings of the parties, and various other documents filed on the public record. The media will also have access to the sentencing hearing itself. There is no need for the media to obtain hours of video surveillance in this matter as having access to everything else on the record will allow the public to have meaningful access to the case without severely

prejudicing the defendant. The court in *Hubbard* explains that while the defendants in that matter had specific privacy interests, that there could be other valid privacy interests as well:

> The kinds of interests cited by the defendants below do not, we think, exhaust the types of particularized privacy interests that might be asserted in the supplemental proceedings, nor do we think that the privacy interests to be protected are limited to those of innocent third parties…..Other valid privacy interests might also be asserted; we do not decide now which are valid and which are not.

*Hubbard*, 650 F.2d at 324.

### f. The purposes for which the documents were introduced during the judicial proceedings

As already mentioned, the purpose of which the full Go-Pro footage was provided to the Court in advance of sentencing was to provide the Court the full context of Mr. Puma's actions throughout the day. However, these materials are not central to the matter – especially because both the government and the defense fully describe the contents of the videos in their sentencing memoranda (which are not under seal). As such, the entirety of these items are not crucial to the judicial records in this case. Unlike in *Hubbard*, Mr. Puma did not contest the lawfulness of the seizure because he voluntarily provided his Go-Pro footage to assist the government in its investigation. That does not mean, however, that the media should have the same access as the FBI and should reap the benefits of such a voluntary and full disclosure – especially given the breadth of the material. Mr. Puma was certainly not on notice that at the time he gave this footage to the federal government, that it could one day be released to the world. Such a result would

create a chilling effect and discourage criminal defendants from making such helpful disclosures in the future.

Lastly, the court in *Hubbard* describes additional policy reasons why some disclosures should not be made to the public by explaining that such information contained evidence of other crimes by persons not charged in the instant proceedings. *Id*. at 323. While Mr. Puma asserts this objection mostly because of the prejudice that would result to him, it is worth also noting that there are many individuals in his Go-Pro footage that have not been charged that are implicated by this surveillance. Release of this footage could lead to prejudice to other uncharged individuals as well.

## III.    In the Alternative, a Limited Disclosure Should be Ordered

The court in *Hubbard* lastly provides the option for the lower court on remand to determine whether its unsealing order should be lifted "in whole or in part." *Id*. at 324. If the Court in this matter is considering releasing any of the materials requested, Mr. Puma requests that the Court consider a partial disclosure, leaving out the personal Go-Pro footage and allowing access to just the CCTV footage that shows Mr. Puma's entry and exit into the Capitol building. This footage is similar to most of the footage that has been released in other cases and would sufficiently serve the purpose of providing public access to judicial records while protecting the privacy interests of the defendant and others and avoiding substantial prejudice to Mr. Puma.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

_____

Maria N. Jacob
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500